Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,
     *Plaintiff-Appellant,*

v.

COMPREHENSIVE DRUG TESTING, INC.,
     *Defendant-Appellee.*

</td><td>

No. 05-10067

D.C. No.
MISC-04-234-SI

</td></tr>
</table>

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

<table>
<tr><td>

MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION,
     *Petitioner-Appellee,*

v.

UNITED STATES OF AMERICA,
     *Respondent-Appellant.*

</td><td>

No. 05-15006

D.C. No.
CV-04-00707-JCM

</td></tr>
</table>

Appeal from the United States District Court
for the Southern District of Nevada
James Mahan, District Judge, Presiding

19783

IN RE: SEARCH WARRANTS EXECUTED
ON APRIL 8, 2004 AT CDT, INC.,
SEAL 1,
                    *Plaintiff-Appellant,*
              v.
SEAL 2,
                    *Defendant-Appellee.*

No. 05-55354
D.C. No.
CV-04-02887-FMC
OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
November 15, 2005—San Francisco, California

Filed December 27, 2006

Before: Diarmuid F. O'Scannlain, Sidney R. Thomas, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Thomas

## COUNSEL

Erika R. Frick, Assistant United States Attorney, San Francisco, California, argued the cause for defendant-appellant United States of America; United States Attorney Kevin V. Ryan, Appellate Chief Hannah Horsley, Assistant United States Attorney Barbara J. Valliere, San Francisco, California; and Assistant United States Attorneys Matthew A. Parrella, Ross W. Nadel, Jeffrey D. Nedrow, Carter M. Stewart, San Jose, California, were on the briefs.

Elliot R. Peters, Keker & Van Nest, LLP, San Francisco, California, argued the cause for movants-appellees Comprehensive Drug Testing, Inc., and Major League Baseball Players Association; Ethan A. Balogh, Keker & Van Nest, LLP, San Francisco, California, and David P. Bancroft and Jeffrey C. Hallam, Sideman & Bancroft, LLP, San Francisco, California, were on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the United States may retain evidence it seized from Major League Baseball's drug testing administrator (and enforce an additional subpoena) as part of an ongoing grand jury investigation into illegal steroid use by professional athletes.

I

These three consolidated cases arise from the federal investigation of the Bay Area Lab Cooperative ("Balco") and its alleged distribution of illegal steroids to professional baseball athletes. The investigation began in August 2002 and, over the following several years, produced evidence—including grand jury testimony—establishing probable cause to believe that at least ten major league baseball players received illegal steroids from Balco. Today we decide the government's appeals from the separate adverse orders of three different district courts: (1) an order by Judge Florence-Marie Cooper in the Central District of California, requiring the government to return property seized from Comprehensive Drug Testing, Inc. in Long Beach, California ("CDT"),[1] (2) an order by Judge James Mahan in the District of Nevada, requiring the government to return property seized from Quest Diagnostics, Inc. in Las Vegas, Nevada ("Quest"),[2] and (3) an order by Judge Susan Illston in the Northern District of California, quashing the government's May 6, 2004, subpoenas to CDT and Quest that related to the grand jury sitting in San Francisco, California.

---

[1]The courts also required the government to turn over all notes made by agents who reviewed the challenged evidence.

[2]Again, the government was also required to give up all notes made by reviewing agents.

A

As part of its investigation into Balco, the government in November 2003 served a grand jury subpoena on Major League Baseball ("MLB"),[3] seeking drug testing information for eleven players[4] with connections to Balco. One month later, MLB responded that it had no such information.

The government then reasoned that because CDT[5] and Quest[6] had tested urine samples from MLB players during 2003, those entities—rather than MLB—had to possess the samples and testing records in question. Therefore, the government issued subpoenas both to CDT and to Quest, seeking drug testing information for all MLB players. The subpoenas were returnable on February 5, 2004, but the government extended that date to March 4, 2004, after CDT and Quest promised not to destroy or to alter any of the evidence requested.

Despite protracted negotiations, CDT and Quest resisted producing any of the subpoenaed materials, explaining that they would fight production of even a single drug test all the

---

[3]"Major League Baseball," an unincorporated association, consists of two professional baseball leagues—the National League of Professional Baseball Clubs and the American League of Professional Baseball Clubs.

[4]The names of the players are under seal and are not disclosed in this opinion.

[5]CDT is a third-party administrator of "drug and alcohol testing programs" that was hired to oversee MLB's drug use evaluation program. The company includes "top experts in pharmacology, forensic toxicology, laboratory management, medical review, legal, and administrative compliance." *See* Comprehensive Drug Testing: About Us, http://www.cdtsolutions.com/about_us.html (last visited Nov. 10, 2006).

[6]Quest offers laboratories that conduct "drugs of abuse testing and therapeutic drug monitoring" with "the most advanced methodologies available." *See* Quest Diagnostics: Diagnostic Testing & Services, http://www.questdiagnostics.com/brand/business/b_bus_lab_index.html (last visited Nov. 10, 2006). Quest's laboratory in Las Vegas performed the drug testing on the player specimens at issue in these consolidated appeals.

way to the Supreme Court. Following further negotiations, the government, believing that a narrower subpoena might be effective, issued new subpoenas on March 3, 2004, seeking documents related only to eleven[7] players with Balco connections. These new subpoenas were returnable on April 8, 2004.

Two days before the new return date, the Major League Baseball Players' Association—the union representing athletes who play for Major League Baseball[8] —informed the government that it intended to file a motion to quash the subpoenas. The following day, as promised, CDT and the Players' Association filed such a motion in the Northern District of California before United States District Judge Jeffrey White.

B

After learning of the planned motion to quash, the government applied on April 7 and April 8, 2004, for warrants to search CDT's Long Beach office and Quest's Las Vegas laboratory. Magistrate Judge Jeffrey Johnson issued a search warrant for the office in his jurisdiction, the Central District of California, and Magistrate Judge Lawrence Leavitt issued a search warrant for the laboratory in his jurisdiction, the District of Nevada.[9] Affidavits submitted to support the warrants noted that the information sought was already the subject of

---

[7]The government later decided not to seek drug testing evidence related to one of the eleven players, and on April 22, 2004, sent a letter to the counsel for CDT withdrawing requests for documents related to that player.

[8]The testing records at issue in these cases were created pursuant to a collective bargaining agreement between Major League Baseball and the players of Major League Baseball (represented by the Major League Baseball Players' Association).

[9]The pursuit of search warrants in different districts was proper under the applicable federal rule, which gives a magistrate judge the authority "to issue a warrant to search for and seize a person or property located within the district," "to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed," or "in an investigation of domestic terrorism or international terrorism . . . [to] issue a warrant for a person or property within or outside that district." Fed. R. Crim. P. 41(b).

grand jury subpoenas and that a motion to quash was expected.[10] Contrary to appellee's arguments, the government never claimed in its affidavits that any evidence was in danger of being destroyed.[11]

The April 7 and April 8 warrants authorized the seizure of drug test records and specimens for ten named Balco-connected players, as well as "[a]ll manuals, pamphlets, booklets, contracts, agreements and any other materials detailing or explaining" CDT's or Quest's "administration of Major League Baseball's drug testing program."[12] The warrants also authorized the search of computer equipment, computer storage devices, and—where an on-site search would be impracticable—seizure of either a copy of all data or the computer equipment itself. "[L]aw enforcement personnel trained in searching and seizing computer data" (designated "computer personnel") were responsible for choosing the appropriate course of action to capture the electronic data sought. If seizure of all data or equipment was necessary, "appropriately trained personnel" would review the data, retaining the evidence authorized by the warrant and designating the remainder for return.

On the morning of April 8, 2004, Special Agent Jeff Novitzky (the lead case agent) and eleven other federal agents —including Computer Investigative Specialist Agent Joseph Abboud—executed the search warrant for CDT's Long Beach office. Although CDT personnel were initially cooperative,

---

[10]The affidavit for the search warrant in the District of Nevada advised the court that Quest "intend[ed] to move to quash the subpoena." Later, that language was crossed out and replaced with a handwritten note: "A motion to quash has been filed. 4.7.04," followed by Judge Leavitt's initials.

[11]*See infra* Section III.A.2.

[12]The April 8 warrant also expressly authorized the seizure of "correspondence" and "e-mails" detailing or explaining Quest's administration of the drug testing program.

one of CDT's directors—after speaking with counsel—informed Agent Novitzky that CDT would not assist federal officers in locating the evidence they were authorized to seize and that the agents should "do what they needed to do." When informed that agents might be forced to seize all computer equipment for up to sixty days, the director again contacted counsel, exclaiming that such a seizure would "shut[ ] the business down."

Throughout the morning and early afternoon, Agent Novitzky spoke several times with CDT's attorney, David Bancroft. Bancroft asked Agent Novitzky not to seize anything while he attempted to work out a beneficial solution with the United States Attorney's Office in San Francisco. Later, Bancroft told the agent that CDT had only one hard-copy document eligible for seizure. Around noon, both Agent Novitzky and Assistant United States Attorney Jeff Nedrow spoke with Bancroft and CDT's directors via conference call. Bancroft emphasized that any help CDT provided should not be construed to constitute consent and then informed Nedrow and Agent Novitzky that CDT had two computers on which agents would find information relevant to the search warrant.

During this conference call, Agent Novitzky learned that agents had discovered a hard-copy document with names and identifying numbers for all MLB players, including some of the ten named Balco players. Agent Novitzky faxed the document, which was not the "only document eligible for seizure" to which Bancroft had alluded, to Nedrow for preparation of another search warrant to seize specimen samples from Quest based on the identifying numbers.[13] One of CDT's directors

---

[13]A separate group of federal agents had simultaneously executed a separate search warrant at Quest's Las Vegas laboratory, but they were unable to locate the specimens to be seized, because the specimens were identified by number only. Agents used the master list from CDT to apply for a third search warrant. The new warrant for Quest was authorized by Judge Leavitt in the District of Nevada at 6 p.m. that evening, and agents seized the then-identifiable Balco players' specimens later that same night. This opinion focuses on the search of CDT, because the motions for return of property were premised on the government's conduct during that search.

became visibly upset when she noticed the document being faxed. She left the premises, but when she returned, she opened a locked drawer and presented agents with a document that contained drug testing results for the ten named Balco players—the document previously described as the only seizable hard-copy document on site.[14]

At 2:35 p.m., a CDT director finally identified a computer directory containing all of the computer files for CDT's sports drug testing programs. This directory, labeled by its original compiler as the "Tracey" directory, contained numerous sub-directories and hundreds of files. Seeing this, Agent Abboud recommended copying the entire directory for off-site analysis, because of the time and intrusiveness involved in searching the voluminous directory on site. Knowing that the warrant required them to rely upon the advice of a computer analyst—here the advice of Computer Investigative Specialist Agent Joseph Abboud—agents copied the directory and removed the copy for later review at government offices.

The search of the CDT facility concluded shortly after 5 p.m., but before he left the premises, Agent Novitzky reviewed with CDT directors the evidence seized during the search. The documents seized included a twenty-five-page master list of all MLB players tested during the 2003 season and a thirty-four-page list of positive drug testing results for eight of the ten named Balco players, intermingled with positive results for twenty-six other players.[15]

---

[14]Some time later, agents located a billing document for CDT's off-site Long Beach storage locker. After agents obtained a fourth warrant, which allowed them to search and seize evidence in the locker, a CDT director agreed to open the compartment for the agents.

[15]Copies of all seized documents were provided to CDT by the government on April 16, 2004.

C

Upon returning to his office in San Jose, California, Agent Novitzky briefly reviewed the contents of the Tracey directory, identifying five subdirectories related to MLB. Within these directories, Agent Novitzky identified files authorized by magistrate judges for seizure, including the master file of positive drug test results.[16] On April 26, 2004, the Players'

---

[16]On April 30, the government applied for a fifth search warrant in the Northern District of California, asking for authorization to "seize" all electronic data "regarding drug specimens, drug testing, specimen identification numbers, athlete identification numbers, and drug test results, retained by [CDT] . . . pertaining to the drug testing of Major League Baseball players, located within the copy of a CDT computer sub-directory currently in the possession of the [Internal Revenue Service ("IRS")] in San Jose, California, identified as the 'Tracey' sub-directory, bearing the following computer file group names: (1) 'MAJOR LEAGUE GROUP' (2) 'MLB BILLING' (3) 'MLB Drug SubCommittee' (4) 'MLB Follow UP' (5) 'MLB IOC.' " Because this copy of the Tracey directory was in the hands of the IRS in San Jose, in the Northern District of California, the government sought the search warrant in that district. Magistrate Judge Howard Lloyd approved the warrant. The government did not notify CDT, presumably because the IRS already had in its possession the copy of the entire directory containing the relevant materials.

The Players' Association subsequently filed a Fed. R. Crim. P. 41(g) motion in the Northern District of California seeking return of any property taken pursuant to the April 30 search warrant, and on August 9, 2004, Judge Illston granted this motion. The government did not appeal the order and does not dispute it now. Instead, the government asserts that it retains the right to review the Tracey directory based upon the April 7 search warrants, a contention we address in this consolidated appeal.

Insofar as the dissent suggests that the pursuit of the April 30 search warrant evidences bad faith harassment by the government and an attempt to evade a possibly adverse order on the motion for return of property filed in the Central District of California, we decline to speculate. We have no reason to believe that the government sought the April 30 warrant for purposes of harassment, rather than to avoid an additional search of CDT that would have followed from authorization to seize the original copy in the Central District. Since no district court has ever held an evidentiary hearing, and the government complied with the commands of the criminal rules to secure search warrants from the magistrate judges in whose districts the property was located, based upon a showing of probable cause that incriminating evidence would be found, we see no signs of bad faith to support the district courts' contrary conclusion.

Association filed motions under Federal Rule of Criminal Procedure 41(g)[17] seeking return of the property seized.

On May 5, using information culled from the Tracey directory, the government applied for new search warrants to seize all specimens and records relating to the over-one hundred non-Balco players who had tested positive for steroids. Magistrate Judge Leavitt in the District of Nevada authorized seizure of the specimens from Quest, and Magistrate Judge Rosalyn M. Chapman in the Central District of California authorized the seizure of records from CDT. Again, the government sought and obtained each warrant from the district court whose jurisdiction encompassed the situs of the property to be searched, as directed by Fed. R. Crim. P. 41(b).[18] The government executed the warrants on May 6, and the Players' Association immediately filed Fed. R. Crim. P. 41(g) motions seeking return of the specimens and records seized.

On August 19, 2004, Judge Mahan granted the Fed. R. Crim. P. 41(g) motion brought by the Players' Association in the District of Nevada and ordered the government to return all specimens seized from Quest and all notes and memoranda compiled by agents who reviewed the evidence, other than those pertaining to the ten Balco players named in the original search warrant.[19] He made findings—without conducting an

---

[17]Fed. R. Crim. P. 41(g) reads:

Motion To Return Property. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

[18]See supra note 9.

[19]The government moved for a stay of this order because the evidence was otherwise lawfully in its possession pursuant to the subpoena of May 6, 2004. Judge Mahan denied the motion on November 1, 2004, based on the government's failure to raise the subpoena argument at the original hearing.

evidentiary hearing—that "[t]he government callously disregarded the affected players' constitutional rights" and that the government unreasonably refused "to follow the procedures set forth in *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982)," with regard to the intermingled records. Almost six weeks later, and again without conducting an evidentiary hearing, Judge Cooper rejected the government's suggestion that the documents were seizable under the warrant exception that applies to plain-view evidence of contraband,[20] and granted the Players' Association's Fed. R. Crim. P. 41(g) motion in the Central District of California. The order, which also cited the government's failure to follow *Tamura*'s procedures, mandated return to CDT of any evidence seized that was not connected to the ten players named in the warrant. Judge Cooper denied the government's motion for reconsideration of this order on February 9, 2005.

These orders are the subjects of two of the appeals consolidated here.

### D

The third appeal concerns grand jury subpoenas issued to Quest and CDT on May 6, 2004, which were to be returned by June 10, 2004. These subpoenas reached all specimens and records of positive steroid drug tests for more than one hundred MLB players, not simply the results for the ten Balco players named in the earlier subpoenas.[21] This evidence was

---

[20]We discuss the inapplicability of this warrant exception in Section III.A.4. *See infra* note 39.

[21]These subpoenas were not the earliest ones issued in the investigation. The first subpoenas dated to January 16, 2004, and mandated the provision of all MLB drug testing records. On March 3, 2004, the government obtained narrower subpoenas for eleven Balco-connected players.

On April 22, 2004, the government sent a letter to CDT withdrawing the January 2004 subpoenas. In the same letter, the government reduced the March 3, 2004, subpoenas to ten, not eleven, Balco players. At the time the government obtained the May 6 subpoenas, the only outstanding subpoenas were those of March 3, which sought the records of ten players with Balco connections.

also pursued in the government's May 5 search warrants. The government sought these later search warrants and subpoenas on the ground that the April 8 seizures did not provide all information needed for the investigation.[22]

Quest complied with the May 6 subpoena, providing the government with hundreds of pages of documents, but the government agreed to defer CDT's compliance pending resolution of the search warrant litigation. On August 31, 2004, however, the government revoked the indefinite deferral and instructed CDT to comply with the subpoena by September 14, 2004. The Players' Association filed a motion to quash the subpoenas on September 13, 2004.

In December 2004, after Judge Illston heard argument on the motion but took no testimony, she found that the government's conduct was unreasonable and constituted harassment. She then filed an order quashing the subpoenas, which the government timely appealed.

## II

Before we review the orders granting the Fed. R. Crim. P. 41(g) motions in the Central District of California and the District of Nevada, we must decide two jurisdictional issues: whether the Players' Association has standing to challenge the search and seizure of evidence from Quest and whether the government timely appealed Judge Cooper's order to return

---

[22]Recognizing that the documents they seized from CDT pursuant to the April 7 search warrant might not have included all documents relevant to the investigation (even with regard to Balco-related players, *see infra* note 37), and deciding that the positive test results uncovered for MLB players beyond the ten with Balco connections could be valuable to the investigation, the government asked for a broader warrant on May 6 in the Central District of California.

the materials seized from CDT in the Central District of California.[23]

A

The government contends that the Players' Association lacks standing to file the Fed. R. Crim. P. 41(g) motion, because it lacked access, control, and ownership over the records and specimens seized from Quest. Furthermore, it argues that the Players' Association may not base its interest in the property (the urine specimens and test results) on the privacy interests of the individual players.[24]

[1] An association has standing to sue on behalf of its members when they would otherwise have independent standing to sue, the interests sought to be protected are germane to the organization's purpose, and the claim asserted does not require the participation of individual members in the lawsuit. *Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988) (citations omitted); *see also Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

---

[23]We need not decide whether the Players' Association has standing to challenge the CDT seizures because CDT is a party and has standing on its own to seek return of the property seized from its office and storage locker.

[24]The Supreme Court has clearly rejected "vicarious" or "target" standing to assert Fourth Amendment rights. *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (refusing to extend standing to a party who was not a "victim" of the search); *see also United States v. Taketa*, 923 F.2d 665, 669-70 (9th Cir. 1991) (following *Rakas*, 439 U.S. at 134, and holding that a defendant did not have standing to challenge a search of another defendant's office). "A person who is aggrieved by an illegal search and seizure *only* through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134 (emphasis added). Because we are satisfied that the Players' Association has met the requirements of associational standing, we do not reach its argument that it has an ownership interest in the seized items sufficient to establish standing in its own right. We leave that question for another day.

**[2]** We are satisfied that the Players' Association satisfies each prong of this test. First, the Players' Association represents all MLB players, each one of whom could certainly sue in his own right to seek return of his own drug test records. Second, the interests sought to be protected—the players' privacy interests in their drug testing records—are related to the organization's sole purpose: to represent the best interests of MLB players. Third, the Players' Association sought only the return of the players' drug testing information and specimens; for this type of prospective relief, the individual players need not be a party to the action. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) (holding that an association lacked standing where it sought damages rather than "a declaration, injunction, or some other form of prospective relief").

**[3]** We therefore conclude that the Players' Association has standing to assert the Fourth Amendment rights of its members and to file Fed. R. Crim. P. 41(g) motions seeking return of seized property in which their members hold privacy interests.

B

**[4]** The Players' Association, for its part, contends that the government failed to appeal in a timely manner Judge Cooper's order for the return of property. In order to be timely when the United States, its officer, or its agency is a party, a notice of appeal must be filed "within 60 days after the judgment or order appealed from [was] entered." Fed. R. App. P. 4(a)(1)(B). Where a district court entertains a motion for reconsideration, the 60-day period is tolled until the motion is decided. *See Scott v. Younger*, 739 F.2d 1464, 1467 (9th Cir. 1984) (noting that a timely filed motion "tolls the running of the time limitations for filing the notice of appeal until the district court rules on the motion").

The "United States' Motion for Reconsideration and Modification of Court's October 1, 2004 Order Granting Return of

Property" was filed on November 19, 2004. In its opposition to that motion, the Players' Association stated that the "government neither invoke[d] nor satisfie[d] any of the requirements of Local Rule 7-18 ["Motion for Reconsideration"] to support its request for reconsideration." The appellees' reply brief suggests that the motion was merely "*styled* as one for reconsideration," and does not actually qualify as such because the motion only "asked the court to water down its findings" without claiming that "the Court failed to evaluate the merits."

We disagree. Like the dissent, we believe the motion was properly construed as one for reconsideration. Unlike the dissent, however, we apply the local rule governing motions for reconsideration, and do not recharacterize the motion as a request for "Relief from Judgment or Order" under Fed. R. Civ. P. 60(b) ("Rule 60(b)").

**[5]** The motion falls squarely within the definition of a "Motion for Reconsideration" under C.D. Cal. Local R. 7-18 ("Local Rule 7-18"). Judge Cooper recognized this when she chose to analyze the motion under Local Rule 7-18. This analysis was proper, for Local Rule 7-18 permits a party to bring a "Motion for Reconsideration" on the basis of a "manifest showing of a failure to consider material facts presented to the Court before such decision." C.D. Cal. Local R. 7-18(c). The government made its motion on precisely these grounds.

The dissent agrees that Local Rule 7-18 applies to such motions, and correctly notes that the "Federal Rules of Civil Procedure do not provide for 'Motions for Reconsideration.' " Dissent at 19858. Instead, "such motions are creatures of local rule or practice." *Id.* The dissent then points out a caveat: "Where a conflict arises between the two, federal rules must prevail." *Id.* (citations omitted). From this point, the dissent draws a far more sweeping conclusion: "For the purposes of appeal, when a local rule based post-judgment motion for reconsideration is made, we construe it either as (1) a motion

to alter or amend a judgment under Rule 59(e) or (2) a motion filed under 60(b) for relief from judgment." Dissent at 19859 (citing *Am. Ironworks & Erectors v. N. Am. Constr. Corp.*, 248 F.3d 892, 898 99 (9th Cir. 2001)). So broad a conclusion is not justified. *Am. Ironworks* does not even mention a local rule in its discussion of Rule 59(e) or Rule 60(b). The case simply addresses which federal rule to apply to a motion *not already treated as a motion for reconsideration under a local rule.*

Even more problematically, the dissent places the cart before the horse by assuming an inconsistency between the federal and local rules before stating which federal rule even applies.[25] We decline so hastily to dispose of a local rule. "Local rules are 'laws of the United States,' " *Marshall v. Gates*, 44 F.3d 722 (9th Cir. 1995) (quoting *United States v. Hvass*, 355 U.S. 570, 575 (1958)), and "valid if . . . 'not inconsistent' with the Federal Rules of Civil Procedure,' " *id.* (citing Fed. R. Civ. P. 83). Unlike the dissent, we look to the text of the rules in order to discern whether such an inconsistency exists. Rule 60(b) reads:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresenta-

---

[25]An initial analysis of the specific local and federal rules is necessary in order to decide whether the rules conflict. Rule 59(e) and Rule 60(b) differ greatly, and a local rule that appears inconsistent with one may well be consistent with the other. *See* Fed. R. Civ. P. 59(e) ("Motion to Alter or Amend Judgment. Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment."); *see infra* at 19803-04 (citing Fed. R. Civ. P. 60(b)).

tion, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60(b). In contrast, Local Rule 7-18 provides:

A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) *a manifest showing of a failure to consider material facts presented to the Court before such decision.*

C.D. Cal. Local R. 7-18 (emphasis added). The government's motion clearly falls under Local Rule 7-18(c), because, as the dissent points out, the government "assert[ed] that the court had ignored evidence and arguments." Dissent at 19863. In contrast, the motion does not fall within Rule 60(b), for the government did not request relief "from the operation of the judgment" but simply and expressly asked the court to "reconsider and modify several aspects of this order which inaccurately characterize the government's actions."[26]

The government neither requested Rule 60(b) relief nor cited the grounds for such relief, which include "mistake,

---

[26]For the same reason, the motion is not one to "alter or amend the judgment" under Fed. R. Civ. P. 59(e).

inadvertence, surprise, or excusable neglect," "newly discovered evidence," "fraud . . . misrepresentation, or other misconduct of an adverse party, a change in the binding nature of the judgment, or "any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P. 60(b)(1)-(6). In the absence of a clear inconsistency between the local and federal rules, we will not apply a general federal rule where a specific local rule is directly on point. As the dissent aptly points out, "[w]e are . . . under an obligation to construe local rules so that they do not conflict with the federal rules, and we have exercised our ingenuity in doing so." *Marshall*, 44 F.3d at 725.[27]

**[6]** Satisfied that the district court correctly analyzed the motion under Local Rule 7-18, we turn to its timeliness, in order to decide whether it tolled the period to file an appeal. Local Rule 7-18 does not expressly set a time frame in which to file a motion for reconsideration. However, the rule has been read to "provid[e] for a reasonable time within which to seek reconsideration." *Meredeth v. Erath*, 2001 WL 1729626, *1 (C.D. Cal.) (Cooper, J.) (defining the relevant period for filing a "Motion for Reconsideration" under then-C.D. Cal. Local R. 7-16, the same rule now codified as C.D. Local R. 7-18). In *Meredeth*, the district judge—the same Judge Cooper whose order is appealed here—found that an eleven-month delay in filing a motion for reconsideration was unrea-

---

[27]*Marshall* does not hold that the possibility of conflict between local and federal rules should be avoided by ignoring the local rule. Indeed, in *Marshall* the court found the local rule applicable, although "the local rule appear[ed] to be inconsistent with the federal rule governing summary judgment to the extent that it bars a party from submitting affidavits in opposition to summary judgment prior to the day of the hearing." 44 F.3d at 724. The court "engage[d] in an interpretation in order to produce consistency," *id.* at 725, and concluded that the federal rule "d[id] not unconditionally require a district court to accept affidavits up to the date set for hearing on the motion for summary judgment." *Id. Marshall* avoided conflict by refusing to interpret the federal rule in a way that would render invalid the local rule. Harmonizing federal and local rules may often leave both intact.

sonable, making the motion untimely under Local Rule 7-18. *Id.* In contrast, Judge Cooper did not conclude that the two-month delay in the motion here was unreasonable and did not view the government's motion in this case as untimely (although the government advised her that it had filed "outside of the normal time frame"). We agree with her determination that the shorter delay here was reasonable. One factor supporting its "reasonableness" is that neither the government nor the movants received the order until November 2, 2004. Given these circumstances, we do not believe Judge Cooper's decision to hear the motion was impermissible under the "reasonable time" period permitted under Local Rule 7-18. *See Meredeth*, 2001 WL 1729626, at *1.

[7] Thus, we are satisfied that the motion for reconsideration was timely filed. Judge Cooper denied the motion on February 9, 2005, tolling the deadline for any appeal until April 9, 2005. The government filed its appeal on March 9, 2005, with thirty days remaining before the filing deadline. The timely nature of that appeal, and of the motion for reconsideration before it, gives us jurisdiction to consider the original order.[28]

## III

The government contends that Judge Cooper and Judge

---

[28]The dissent takes a curious position, at once arguing that "the district court did not have jurisdiction to consider the original motion" and at the same time stating that the district court's denial of the motion for reconsideration—following a three-page discussion of the merits of the motion—was "proper." In the absence of jurisdiction, a discussion of the merits is inappropriate. *See Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 379 (1981) (noting the familiar rule that a "court lacks discretion to consider the merits of a case over which it is without jurisdiction"). In the absence of jurisdiction, dismissal—not denial on the merits—is appropriate.

Mahan improperly exercised equitable discretion to hear and to grant the respective Fed. R. Crim. P. 41(g) motions.[29]

A district court may exercise equitable jurisdiction to hear such motions only after analyzing the four factors set out in *Ramsden v. United States*, 2 F.3d 322 (9th Cir. 1993). Specifically, the court must consider

> 1) whether the Government displayed a callous disregard for the constitutional rights of the movant; 2) whether the movant has an individual interest in and need for the property he wants returned; 3) whether the movant would be irreparably injured by denying return of the property; and 4) whether the movant has an adequate remedy at law for the redress of his grievance.

*Id.* at 325. Both district courts here found that all four factors weighed in favor of equitable jurisdiction.

Because the government now concedes that the parties have no adequate remedy at law, we only need to discuss the first three *Ramsden* factors.

## A

Interestingly, the Players' Association does not challenge the validity of the warrants authorizing the April 8 searches. Thus, we assume that probable cause existed to support issuance of the search warrants for the property to be seized from the places named in each warrant. Nevertheless, the Players' Association defends the grant of its motions for return of

---

[29]We review a district court's decision to exercise equitable jurisdiction under Fed. R. Crim. P. 41(g) for abuse of discretion. *Ramsden*, 2 F.3d 322, 324 (9th Cir. 1993). We review the district court's interpretation of Fed. R. Crim. P. 41(g) de novo. *Id.* The lawfulness of a search and seizure is also reviewed de novo. *United States v. Mendoza-Ortiz*, 262 F.3d 882, 885 (9th Cir. 2001) (per curiam).

property, arguing that the government acted in callous disregard of the Fourth Amendment rights of the Players' Association, the MLB players, and CDT, offering a farrago of arguments to that end. We consider each in turn.

1

**[8]** The Players' Association first argues that the government sought search warrants in an attempt to avoid judicial review of the overboard January 2004 subpoenas. We are aware of no authority that the simultaneous pursuit of search warrants and subpoenas in aid of an ongoing grand jury investigation constitutes a violation of the Fourth Amendment. Neither can we accept that the government could not have obtained and executed a search warrant had the January subpoenas been quashed. The government argues—and we have previously recognized—that subpoenas and search warrants are not the same. *See In re Grand Jury Subpoenas Dated December 10, 1987*, 926 F.2d 847, 854 (9th Cir. 1991); *see also infra* Section V. Unlike a subpoena, a search warrant may be obtained only upon a showing of probable cause—a burden the government sometimes considers necessary to establish in order to obtain certain production of evidence.[30] In contrast, a grand jury subpoena may issue simply because an Assistant United States Attorney believes the evidence may assist the grand jury in furthering the progress of an ongoing investigation which may never establish probable cause to charge anyone. The "[grand jury] . . . has the right to every man's evidence," *United States v. Calandra*, 414 U.S. 338, 345 (1974) (internal quotation marks omitted; second alteration in original), and an indictment may be obtained

---

[30]Significantly, while a subpoena may be quashed, a "person to be searched has no lawful way to prevent execution of the warrant." *In re Grand Jury Subpoenas Dated December 10, 1987*, 926 F.2d at 854. His remedy for an unlawful search and seizure or for the deprivation of property is to seek return of anything seized under Fed. R. Crim. P. 41(g), or, if charges are filed, to move to suppress use of the evidence against him at trial, *see* Fed. R. Crim. P. 12(b).

even on the basis of illegally seized evidence. *Id*. at 351-52. In any event, persons aggrieved later may litigate the seizure and subsequent use of the evidence, as provided in the Federal Rules of Criminal Procedure. We fail to see how the government's compliance with the procedural and evidentiary burdens necessary to obtain a search warrant from a neutral and detached magistrate can be interpreted as callous disregard of the Fourth Amendment.

2

Next, the Players' Association accuses the government of making "misleading representations" in applying for the search warrants. In her October 1 order, Judge Cooper accepted this argument, finding that:

> [I]n seeking the warrant (not the correct procedure for obtaining documents from a third party who is not a suspect), the Government explained to the Magistrate that the records in question were in danger of being destroyed. This is a blatant misrepresentation, as demonstrated by the records in this case.

Unfortunately, Judge Cooper's conclusion misstates established Fourth Amendment jurisprudence,[31] under which "valid warrants may be issued to search *any* property, whether or not

---

[31]To the extent that Judge Cooper relied on any failure by the government to comply with the United States Attorney's Manual, such reliance is unwarranted. The Manual "does not create any substantive or procedural rights," *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000), and thus any violation of procedures established therein cannot independently establish a Fourth Amendment violation. We do not suggest that deviations from United States Attorney's Manual have no significance. Rather, we conclude that such deviations in the case at bar do not rise to the level of a constitutional or statutory violation that would render granting a motion for return of property appropriate. It certainly does not support an order depriving the grand jury of the use of such evidence in aid of its expanded criminal investigation.

occupied by a third party, at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found." *Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978).

[9] More importantly, Judge Cooper's finding derives no support from the record. Magistrate Judge Johnson expressly found to the contrary, and neither judge heard any evidence from witnesses as the Player's Association had urged. In applying for the search warrants in this case, the government never informed any judge that evidence was in danger of being destroyed. Remarkably, despite its submission of fourteen volumes of supplemental excerpts of record, the Players' Association provides only a solitary citation to show such "blatant misrepresentation." Tellingly, the only arguable allusion to destruction of evidence is found in the government's opposition to the Players' Association's Fed. R. Crim. P. 41(g) motion—made *after* execution of the search warrants, not to obtain them. There, the government retrospectively explained that it "had good-faith reasons to believe that CDT was detrimentally delaying the investigation, and that there was some danger of the availability of the sought-after records being jeopardized." The government never suggested this concern as a reason for any court to grant a search warrant in the first place. The district court's finding to the contrary was clearly erroneous.

The Players' Association also accuses the government of repeatedly failing to inform judges from whom search warrants were obtained that CDT was seeking to quash the subpoena. The dissent accepts this argument and paints a picture of deliberate concealment. Unfortunately, this picture is not supported by the record. The dissent contends that "[t]he government never brought to the magistrate judge's attention that there was a motion pending in the Northern District of California to quash the grand jury subpoena." Dissent at 19836. However, in his search warrant affidavit filed on April 7, 2004, Agent Novitsky expressly advised the court that "CDT

has declined to comply with the [March 3 grand jury] sub-poena and has *stated its intent to attempt to quash the subpoe-na*."

The government had no reason to refer to a *pending* motion to quash the grand jury subpoena, as no such motion was filed prior to April 7, 2004. Indeed, Agent Novitsky filed for the search warrant in the Central District on the *same day* that CDT moved to quash the grand jury subpoena in the Northern District.[32] Parties must reveal relevant facts, but they are not required to be prophetic.

[10] The record reflects similar candor on the part of government agents in the District of Nevada, where the government submitted affidavits for a search warrant also on April 7. There, too, the government advised the court of the existing subpoena as well as Quest's intention "to move to quash the subpoena." Alerted to the impending motion to quash, Judge Leavitt noted the date when the motion ultimately was filed.[33] As in the Central District of California, the record contradicts any suggestion that the government failed to reveal a pending motion to quash.

3

The Players' Association next argues that the government used the search warrants for the records of the ten named Balco players as a pretext to seize the records of other MLB players. In support, they cite *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978), where the police obtained a warrant for marijuana paraphernalia after failing a day earlier to obtain a warrant to search for evidence of a cocaine smuggling conspiracy. *Id.* at 422-23. During the ensuing search, officers told

---

[32]The record does not contain evidence that the motion to quash was filed in the Northern District early enough in the day for the government to know of it before filing its affidavit in the Central District.

[33]*See supra* note 10.

the suspect's wife to "tell us where [the cocaine] is so we don't have to mess up your house." *Id.* at 422 n.1.

Such egregious police misconduct did not occur here. Agents executing the warrant at CDT were authorized to seize the drug testing records of the ten named Balco players. In their lawful search for those records, they found paper and electronic data related to those players, intermingled with data pertaining to additional MLB players not mentioned in the search warrant. One document, at issue here, was a spreadsheet of positive drug test results, where results for eight of the ten named Balco players were intermingled with results for other MLB players. Because the agents saw that the spreadsheet clearly contained information within the scope of the warrant, they seized the spreadsheet for off-site review.

**[11]** The record contains no support for the assertion that agents specifically targeted and seized records unrelated to the players mentioned in the search warrant. To the contrary, the agents narrowed their seizures to files containing information on the named Balco players, and during the May 6 search at Quest, they seized specimens belonging only to the ten Balco players. Finally, the agents copied relevant files in order to avoid an excessively long and intrusive on-site search, although duplication risked the loss of deleted documents that would only be visible on the original drives.

**[12]** We see no evidence of bad faith or pretext here.

### 4

Nor does the seizure of intermingled documents demonstrate "a callous disregard for the constitutional rights of the movant." *Ramsden*, 2 F.3d at 325 (stating the first factor weighing in favor of equitable jurisdiction over a motion for return of property). In this analysis, we focus on the Fourth Amendment and note that "[a]s always under the Fourth Amendment, the standard is reasonableness." *United States v.*

*Hill*, 322 F. Supp. 2d 1081, 1088 (C.D. Cal. 2004) (Kozinski, Circuit J., sitting by designation). Reasonableness can be especially difficult to define in the computer context, given the well-known "difficulties of examining and separating electronic media at the scene." *Hill*, 322 F. Supp. 2d at 1090. Fortunately, our prior precedent reveals that agents can avoid the opposing errors of leaving behind essential information and sweeping up excessive evidence.

[13] In *United States v. Beusch*, 596 F.2d 871 (9th Cir. 1979)*,* this court addressed a motion to suppress seized evidence consisting of ledgers containing items covered by the search warrant intermingled with items not covered by the search warrant. *Id.* at 876-77. The *Beusch* court concluded that no Fourth Amendment violation occurred when agents seized "single files and single ledgers, i.e., single items which, though theoretically separable, in fact constitute one volume or file folder." *Id.* at 877.

The *Beusch* court expressly limited its reach, however: "[T]he reasons we have given for allowing [such] seizure may not apply to sets of ledgers or files, but because that is not the case here, we find it unnecessary to discuss it further." *Id.* Three years later, the court addressed the seizure of sets of files. *See Tamura*, 694 F.2d 591. In *Tamura*, the court reviewed the conduct of officers executing a search warrant, which authorized seizure of three specific categories of records from a Los Angeles office. *Id.* at 594. In that case, agents seized—without any limiting effort—files unrelated to the items mentioned in the search warrant. *Id.* at 595. The *Tamura* court condemned such "wholesale seizure for later detailed examination of records not described in a warrant." *Id.*

Unfortunately, the *Tamura* court did not answer a more difficult question: "Because seizable materials are seldom found neatly separated from their non-seizable counterparts, how much separating must police do at the scene to avoid taking

items that are neither contraband nor evidence of criminal activity?" *Hill*, 322 F. Supp. 2d at 1088. As the *Hill* court noted, the answer turns upon "reasonableness," *id.*, a standard that offers little guidance to government agents. Understandably, the *Tamura* court sought to give more concrete advice to help agents remain within the bounds of the Fourth Amendment. The court suggested:

> In the comparatively rare instances where documents are so intermingled that they cannot feasibly be sorted on site, we *suggest* that the Government and law enforcement officials generally can avoid violating fourth amendment rights by sealing and holding the documents pending approval by a magistrate of a further search, in accordance with the procedures set forth in the American Law Institute's Model Code of Pre-Arraignment Procedure.

*Tamura*, 694 F.2d at 595-96 (emphasis added). Given that the *Tamura* court found that the agents had violated Fourth Amendment rights by making a "wholesale seizure," *id.* at 595, this alternative, protective approach was advisory dicta in that case. *See Hill*, 322 F. Supp. 2d at 1090 (noting that after the *Tamura* court "held that the government's wholesale seizure of company documents was illegal because the agents intentionally seized materials they knew were not covered by the warrant . . . the *Tamura* court suggested, *albeit in dicta*, that [for such seizure of all computer storage media] a warrant would be appropriate." (emphasis added)).[34]

**[14]** The *Tamura* court also stated that substitute protective procedures could be specified in a search warrant, pursuant to which "*all items* in a set of files may be inspected during a search." *Id.* at 595 (emphasis added). In the cases at bar, the

---

[34]The *Tamura* court suggested that the American Law Institute's Model Code of Pre-Arraignment Procedure could guide agents to avoid constitutional violations. 694 F.3d at 595-96.

search warrants spelled out such specific procedures that the agents were to follow. We believe that the agents in the cases at bar complied with the procedures specified in the warrant:

> Upon searching the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") . . . [to] make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data. . . .
>
> If the computer personnel determine that it is not practical to perform an on-site search or make an on-site copy of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.

The government executed the warrant under the guidance of Agent Abboud—a Computer Investigative Specialist,[35] and took care to avoid unreasonable seizures.

Even so, the Players' Association contends that the government breached the warrant's protocol, because Agent Novitzky opened and viewed the contents of the Tracey directory, rather than leaving Agent Abboud to search alone. Under this view, *only* Agent Abboud qualified as the "appropriately trained personnel" and no other agent had authority to open and to view CDT computer data. However, the plain

---

[35]We note that these requirements are not the mandates of the Fourth Amendment. If the warrant had not specified the need for computer analysts, police would have been "free to hire such experts to help them conduct a search . . . and it may well be praiseworthy for them to do so. . . . But the Fourth Amendment does not require it." *Hill*, 322 F. Supp. 2d at 1088 (citing *Tamura* and other cases that suggest the involvement of specialized personnel) (citations omitted).

language of the search warrant does not *exclude* the assistance of other law enforcement officers—especially for tasks involving non-digital work (such as seeking cooperation from persons on site). The warrant only required that computer personnel assess the possibility of on site search completion. It did not preclude others from assisting the computer personnel.[36] The sort of assistance provided by Agent Novitzky, a non-specialized law enforcement officer, was permissible under the search warrant and was reasonable under the Fourth Amendment.

[15] Moreover, the agents did not remove files without a relation to the Balco investigation and did not seize entire categories of documents to coerce employees into cooperation, as did the agents in *Tamura*. *See* 694 F.2d at 595. Their ultimate decision to remove a relevant number of files for off-site review stemmed not from disregard of privacy rights, but from sensitivity to the ongoing disruption caused by the search to CDT—an innocent third party in the underlying

---

[36]We do not believe that the warrant can be fairly read to require computer personnel to execute all aspects of the search. For example, the more basic computer recoveries could easily be completed by nonspecialized law enforcement officers, considering that the type of files at issue were simple spreadsheets. In today's world anyone with the most rudimentary computer skills qualifies as "appropriately trained" when it comes to opening and viewing basic spreadsheets on a modern computer: presumably any computer user can double-click a selected document or press the "Enter" key after selecting the desired file.

We recognize that, had CDT stored test results in a Relational Database Management System requiring specialized expertise to extract data, only an agent specifically trained in using such a system might be considered "appropriately trained." However, we do not interpret the warrant to require only Computer Investigative Specialists to perform elementary tasks such as scan a spreadsheet for the persons named in a search warrant, particularly when, in the end, the spreadsheets would still have been seized. The search warrant form employed in these cases authorized a search by "Any Special Agent[s] with the United States Internal Revenue Service or any other authorized officer," and was not restricted to searches only by computer investigative specialists.

investigation. The agents permitted CDT to retain the original Tracey directory, even though they later explained that this decision may have prevented them from accessing deleted or temporary files that could not be transferred by duplication.[37] The agents took only a limited set of clearly relevant disks and a *copy* of the Tracey directory, which included information on players specifically named in the search warrant. Furthermore, just eight days after the search warrant, the agents provided copies of all seized documents to CDT. Here again, the agents demonstrated the careful regard absent in *Tamura*.[38]

We reject the dissent's view that government officials should limit their computer searches to key words suggested by a searched party. Criticizing the government for "cop[y-ing] the entire directory" rather than "copying only the subdirectories that pertained to Major League Baseball," the dissent suggests that the government should have trusted CDT to

---

[37]Recognizing that the documents they seized on April 8 may not have included all documents relevant to the investigation, Agent Novitzky asked for a broader warrant on May 5 in the Central District of California. He explained that "IRS Special Agent Jeff Jack, a Computer Investigative Specialist . . . gave me specific examples of deleted files or temporary files created when printing a file that cannot be[ ] seen or retrieved from a simple copy of a computer sub-directory, but may be retrievable using forensic tools, if allowed to examine the entire computer system." Had the government engaged in a "wholesale seizure" of all *possibly relevant* material, as in *Tamura*, they surely would have seized the entire computers, rather than made duplicates so as to allow CDT to continue its use of the originals. *See also United States v. Scott-Emuakpor*, 2000 WL 288443, *8 (W.D. Mich.) ("[T]he agents were not confined to searching the files on the hard drive and disks but could also lawfully search for deleted material . . . the seizure of [items other than hard drives and disks] was reasonable because it allowed the agents to preserve the computer system as it existed for the computer analysts . . . without taking the risk of losing any files.").

[38]In *Tamura*, the agents retained master volumes they knew held information not covered by the search warrant "for at least six months after locating the relevant documents." *Tamura,* 694 F.2d at 597. In contrast, the agents in the cases at bar never seized the master hardware with the Tracey directory.

point out the relevant files. Dissent at 19839. The dissent explains that this approach would have allowed the government to select the relevant files on-site: "Dr. Jean Joseph of CDT later stated in an affidavit that the directory was easily searched by key word and would have provided the test information about the ten players in a short period of time." *Id.*

[16] The government had no duty to rely on CDT to illuminate the files seizable under the warrant. Like most searched parties, CDT had an incentive to avoid giving over documents the government might not know to miss. The government had no reason to confine its search to "key words" such as the names of the baseball players. Such a limited search could easily have overlooked relevant documents, as it would have in the case of the seizures at Quest. There, testing results were not saved by key word at all. They were labeled with identification numbers, whose connection to specific players could not be found within the document or at the facility, but were linked in a document kept in a storage locker located at a different address. See *supra* Section I.B, notes 13-14 and accompanying text.

[17] The government was not required to believe, and had no reason to assume, that all relevant documents in the Tracey Directory would be listed under the names of the baseball players in the warrant. The government's decision to copy the entire directory represented a conscientious effort to seek out all the evidence covered by the search warrant. We do not discern bad faith or "callous disregard" simply because the agents determined, after an initial review, that certain intermingled files needed to be reviewed off site, as permitted under our applicable precedents and the warrant itself.[39]

---

[39]We do not reach the government's argument that the "plain view" exception to the warrant requirement justified seizure of the intermingled evidence, because the evidence fell within the scope of the search warrant. *See Beusch*, 596 F.2d 871 ("Because we hold that the items seized were covered by the terms of the warrant, we find it unnecessary to deal with the Government's contentions that they were admissible under the 'plain view' exception to the warrant requirement.").

5

**[18]** In light of these considerations, we conclude that the government properly considered and respected the privacy interests, intrusiveness, and law enforcement needs posed by the searches in question by removing a copy of the Tracey directory (not the original) and taking only limited diskettes and documents containing relevant information. In seizing these files, the government did not show "callous disregard for the constitutional rights of the movant," *Ramsden*, 2 F.3d at 325, but instead displayed attentiveness both to the warrant's precautionary procedures and to the importance of avoiding unnecessary disruption of CDT's business operations. For these reasons, we conclude that the first prong of the *Ramsden* analysis (the existence of "callous disregard") weighs against invocation of the district court's equitable jurisdiction over the Fed. R. Crim. P. 41(g) motions. The district courts' conclusions to the contrary were based on faulty conclusions of law and unsupported assertions of fact. They cannot survive appellate review.

B

As to the second of the four *Ramsden* factors (the movants' individual interests in the evidence seized), the Players' Association argues that its interests in the property mirror those of its members. We agree that the members possess strong privacy interests in both their drug test results and the actual specimens. *See Roe v. Sherry*, 91 F.3d 1270, 1274 (9th Cir. 1996) (recognizing an individual's "strong interest in protecting the confidentiality of [one's] HIV status"). Because the Players' Association exists to represent such interests, the district courts properly found that this factor weighed in favor of equitable jurisdiction.

C

The district courts also found satisfied the third *Ramsden* factor (likelihood of irreparable injury if the evidence were

not returned). As the Players' Association notes, the public release of positive drug testing evidence could irreparably damage the careers of the affected players, even if the positive results were not actually caused by illegal steroid use. Based on this danger, we agree that the third factor also weighs in favor of equitable jurisdiction.

D

[19] Although we conclude that the district courts erred in finding callous disregard of Fourth Amendment rights, the three other equitable jurisdiction factors weigh in favor of hearing the motions by the Players' Association and CDT. *See Ramsden*, 2 F.3d at 326 (holding that three factors justified exercise of equitable jurisdiction to hear Fed. R. Crim. P. 41(g) motion). As such, we cannot say that either district court's initial choice to hear the motion constituted an abuse of discretion.

IV

We turn now to the merits of the substantive rulings issued by Judge Cooper and Judge Mahan that ordered return of all property other than evidence directly related to the ten players named in the search warrants.

A

With respect to property taken during search warrants, Fed. R. Crim. P. 41(g) provides that a person who is deprived of property may move for its return. When such a motion is granted, the property in question must be returned to the moving party, but a court "may impose reasonable conditions to protect access to the property and its use in later proceedings." *Id.* Although the rule itself does not set a standard for determining when property should be returned to a moving party, an advisory committee note explains that "reasonable-

ness under all of the circumstances must be the test." Fed. R. Crim. P. 41 advisory committee's note.

**[20]** We have repeatedly held that a Fed. R. Crim. P. 41(g) motion is properly denied if "the government's need for the property as evidence continues." *United States v. Fitzen*, 80 F.3d 387, 388 (9th Cir. 1996) (internal quotation marks omitted); *United States v. Mills*, 991 F.2d 609, 612 (9th Cir. 1993) (same). The advisory committee note explains: "If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable." Fed. R. Crim. P. 41 advisory committee's note.

**[21]** It is when the government *no longer needs* the property as evidence that a presumption arises, giving the owner a right to have the property returned. *Fitzen*, 80 F.3d at 388. Here, the government already has provided copies of all documents seized, and it states that the remaining evidence is essential to its investigation and prosecution of the distribution of illegal steroids. This legitimate law enforcement purpose makes return of the intermingled evidence improper, as the files were seized legally under the search warrant and our precedent.

Moreover, even in cases where agents seized too much evidence, we have noted that return of property should follow only a particularly egregious violation: "The issue is whether the Government's conduct was sufficiently reprehensible in this case to warrant this sanction." *Ramsden*, 2 F.3d at 327. In *Ramsden*, we refused to impose this extreme sanction on police who had time to obtain a warrant but made no effort to do so and "simply chose not to comply with [their] obligations under the Fourth Amendment." *Id.* at 325, 327.

**[22]** Our governing precedent offers no support for a full return of the intermingled evidence. Indeed, both the *Beusch* and *Tamura* courts underscored the need for effective criminal law enforcement. Thus, the *Beusch* court resolved: "As

long as an item appears, at the time of the search, to contain evidence reasonably related to the purposes of the search, there is no reason—absent some other Fourth Amendment violation—to suppress it." 596 F.2d at 877. Even the *Tamura* court—which determined that the agents unambiguously flouted the limits of the search warrant—concluded: "[W]e cannot say, although we find it a close case, that the officers so abused the warrant's authority that the otherwise valid warrant was transformed into a general one, thereby requiring all fruits to be suppressed." *Tamura*, 694 F.2d at 597.

In *Tamura*, the government did not seek to use evidence at trial that fell outside the scope of the warrant. Therefore, the court found return of the seized property inappropriate, even though some evidence had been unlawfully taken. In the cases before us today, the government has made clear that it desires to use only information related to the ten named Balco players and to other players who tested positive—and who therefore may have become targets of an expanded grand jury investigation—as a result of intermingled information we have determined was seized lawfully under the warrant. While we agree that some information still retained by the government, at least in duplicate, may fall outside the scope of the warrant, we do not believe a return of the lawfully seized intermingled evidence properly remedies that wrong.[40]

[23] Thus, the district courts erred in granting the Fed. R. Crim. P. 41(g) motions and ordering the government to return all evidence seized from CDT and Quest—and all related notes by agents who reviewed the evidence—that did not relate to the ten Balco players expressly named in the search warrants.

---

[40]The orders of the two district courts would require the return of *all* evidence other than that related to the ten named players. We have described in detail why this view misinterprets *Tamura* in a way that would invalidate lawful and reasonable searches and seizures. It would also hamper the public interest in full and comprehensive investigations as leads unfold in the course of the grand jury's inquiries.

B

**[24]** We are persuaded that the government's seizure of intermingled evidence for off-site review was lawful and reasonable, and we view the two orders requiring return of all property related to players not specifically named as both unjustified and improper. However, the government has yet to comply with its duty of adequate off-site review. *Tamura* offered a suggested procedure for review by a neutral magistrate, and we conclude that such review is necessary to ensure that the seizure of intermingled computer records remains reasonable.

The *Tamura* court urged that off-site review be conducted by a magistrate, in order to avoid giving the task to a party with an interest in retaining too much.[41] We cannot accept the government's argument that it may retain *all* evidence simply because it assured the Players' Association and CDT (without signs of bad faith) that it did not intend to use all the files. In the case of a lawful and reasonable seizure of intermingled computer records for off-site review, as at bar, our precedents and the general reasonableness mandate of the Fourth Amendment require the supervision of a magistrate. It is not reasonable to allow the government to seize an indeterminately bounded array of computer data only later to set its own standards for review and retention thereof.[42]

---

[41]It is not necessary that a magistrate always give *advance* authorization for seizures of intermingled evidence. Here, as in *United States v. Hay*, 231 F.3d 630 (9th Cir. 2000), we do not read *Tamura* to require prior authorization for off-site review. *See id.* at 637 (finding *Tamura* "inapposite . . . for its suggestion that magistrate judges should approve seizure of materials beyond those described in the warrant *before* wholesale removal occurs" (emphasis added)). However, we still read *Tamura* to apply in a significant way in the context of lawful seizures of intermingled computer data.

[42]We do not belabor the government's alleged failure to follow its own internal guidelines. The dissent takes note that the U.S. Attorney's manual states "that a search warrant should normally not be used to obtain confi-

It is true that *Tamura* proposed a pragmatic approach, and not a constitutional rule. We recognize that some courts in other circuits have questioned the procedures advised in *Tamura*. One district court in Michigan explained: "The Court declines to follow *Tamura*, at least in this case, because *Tamura* did not involve computer files and therefore did not consider the specific problems associated with conducting a search for computerized records." *Scott-Emuakpor*, 2000 WL 288443, at *8. Although declining to apply *Tamura*'s pragmatic approach to computer searches, Judge Quist stated: "This is not to suggest that seizure of all computer disks is permissible whenever the warrant authorizes the seizure of computer records." *Id.* Another court, also referencing *Tamura*, noted that in the modern computer context a " 'suggestion' by a panel of the Ninth Circuit in a 20-plus year old case is not persuasive." *United States v. Kaufman*, 2005 WL 2304345, at *4 n.3 (D. Kan).

Like these district courts from other circuits, we recognize that the computer era adds new complexity to the test of reasonableness under the Fourth Amendment. Precisely for this reason, we view *Tamura* as especially important in the computer context. Although indeed writing over two decades ago, the *Tamura* court appreciated the same dual—and sometimes conflicting—interests of minimizing the intrusiveness of searches and containing the breadth of seizures. The *Tamura* court stated that "large-scale removal of material" can be justified "where on-site sorting is infeasible and no other practical alternative exists," *Tamura*, 694 F.2d at 596, but also

---

dential materials such as treatment records," and that the Department of Justice's guidelines disfavor use of a search warrant where a subpoena would suffice. *See* Dissent at 19866. The existence of those guidelines is not disputed. Yet, quite simply, the government's guidelines do not dictate what is "reasonable" under the Fourth Amendment. If its guidelines did so, the government would have every reason to enact permissive internal rules. We have no reason or authority to give the government that perverse incentive.

advised that a magistrate should oversee the off-site review of documents. We conclude that upon a proper post-seizure motion by the aggrieved parties, the record should be sealed and reviewed by a magistrate—such as the one who originally issued the warrant.[43] This procedure affords the necessary protection against unreasonable retention of property after a seizure of intermingled computer data.

Insofar as the dissent emphasizes the crucial need to set parameters on government seizures and retention of intermingled computer evidence, we agree. On the other hand, the dissent attempts to limit computer searches and seizures to an unreasonable degree—one neither warranted by the Constitution nor by our precedent. The dissent would affirm the district courts' Fed. R. Crim. P. 41(g) orders in toto, relying upon *Tamura* yet failing to recognize the continued relevance of *Beusch*. This extreme approach, which would forbid the seizure of intermingled data, would compel law enforcement agents, when unexpectedly confronted with intermingled computer data, to give up the search and leave. They could only return to the scene if equipped with a new warrant authorizing removal of the specific intermingled evidence, repeating this procedure until all relevant intermingled evidence were obtained. After many such warrants and intrusions, the intermingled evidence might well no longer be intact. Moreover, rather than limit the intrusiveness of a search and sei-

---

[43]The dissent mistakenly concludes that this procedure allows the government to establish "what the Fourth Amendment required it to do in the first : instance: [that] probable cause exists to seize and search the property." Dissent at 19894. The point of the *Tamura* procedure is to ensure that intermingled documents, legitimately seized for off-site review under a warrant *supported by probable cause*, do not contain documents that turn out, upon scrutiny, to be easily separable. In a seizure of a plethora of documents containing relevant material interspersed with irrelevant documents, it is predictable that some documents, although legitimately seized for off-site review, turn out to be separable without changing the nature of the relevant documents. The purpose of the *Tamura* procedure is to monitor the off-site separation process, not to establish probable cause.

zure of intermingled computer data by allowing the government to remove the whole for off-site review, the dissent's approach would magnify unnecessarily the burdens imposed by computer search warrants, both on the government and on the parties searched, with no corresponding benefit in light of the constitutional linchpin of reasonableness in Fourth Amendment jurisprudence.

**[25]** We conclude that, while the government may seize intermingled data for off-site review to minimize intrusiveness of a computer search, it may not retain or use the evidence after proper objections are raised, unless a magistrate subsequently reviews and filters the evidence off-site.[44] The magistrate must adhere to our precedent in a balanced manner. In her review, the magistrate should apply our precedent, including *Beusch*, which permits the seizure of single ledgers or files with intermingled data. In the context of computer files, we believe that most seized materials can be pared down considerably, but that certain files—spreadsheets of only a few pages, for example—may be retained in whole.[45]

After the magistrate determines which sealed items fall within the search warrant, the government may retain and use

---

[44]We note that the government has little to lose by following this precaution. A magistrate will allocate to the government whatever property it may legitimately retain under the warrant. Yet if agents rely on their own judgment, they may err on the side of retaining items outside the search warrant or err on the side of returning evidence our precedents would permit them to retain.

[45]In this analysis, the magistrate may consider relevant, among other factors: 1) whether evidence mentioned in the search warrant can be separated from unrelated evidence by copying or moving files, but without creating new documents, 2) whether the file, if printed, would fill more than a typical paper ledger (of the sort in *Beusch*), 3) whether excision of the unrelated portions of the document would distort the character of the original document. This list is neither exhaustive nor mandatory, but offers relevant considerations for a magistrate to determine what evidence the government can reasonably retain after a lawful seizure of intermingled digital data.

such items; all others must be returned to the person or entity searched.[46] The government is always free to seek judicial authorization, either through subsequent search warrants or district court authorization on review of the magistrate's rulings, to justify expansion of the investigation upon proper showing of any item's relevancy to suspected criminal behavior uncovered during review of the evidence initially seized.

**[26]** In this case, we conclude that the proper remedy is to remand these Fed. R. Crim. P. 41(g) matters to the appropriate district courts, for the purpose of sealing the materials seized under the search warrants and transferring them to a magistrate for expeditious review and isolation of the files that the government may legally retain.

V

Finally, we consider the government's appeal of Judge Illston's order quashing the May 6 subpoenas, which sought drug testing records and specimens for all MLB players who tested positive for steroids.[47]

**[27]** Under Fed. R. Crim. P. 17(c)(2), a "court may quash . . . [a] subpoena if compliance would be unreasonable or oppressive." The district court found that the May 2004 subpoenas constituted harassment and were unreasonable.[48]

---

[46]This approach does not permit the government to seize computer files "wholesale," without any effort to limit the documents seized. Nothing we suggest lifts the Fourth Amendment's bar on "unreasonable searches and seizures." U.S. Const. amend. IV. Like the *Beusch* and *Tamura* courts, we point out the parameters of a reasonable search and seizure in the complex context of intermingled files. Case-by-case evaluation remains essential, because our Founding Fathers chose a general prohibition on unreasonable searches; they did not create a rigid rule that could at times prove too permissive and at times prove too strict.

[47]We review a district court's decision to quash a grand jury subpoena for abuse of discretion. *In re Grand Jury Subpoenas*, 803 F.2d at 496.

[48]The district court did not find that the subpoenas were oppressive.

To support its finding, the district court pointed to *United States v. American Honda Motor Co.*, 273 F. Supp. 810 (N.D. Ill. 1967). In *American Honda*, the government issued subpoenas that were "substantially identical" to one another but in different locations. *Id.* at 819. As a result, Honda was faced with producing the same documents repeatedly, and the court found this to be harassment. *Id.* at 819-20. *American Honda*, however, does not preclude the government from pursuing the same information through the contemporaneous issuance of subpoenas and applications for search warrants.

We addressed the issuance of contemporaneous search warrants and subpoenas in *In re Grand Jury Subpoenas Dated December 10, 1987*, 926 F.2d at 854. There we upheld the validity of the subpoenas against the challenge that "the subpoenas were served at the same time as the search warrants and the federal agents attempted to 'enforce' the subpoenas through immediate seizure of the documents." *Id.* at 854. Noting that the challenge to the subpoenas received no support in precedent, we clarified the differences between subpoenas and search warrants:

> Subpoenas are not search warrants. They involve different levels of intrusion on a person's privacy. A search warrant allows the officer to enter the person's premises, and to examine for himself the person's belongings. The officer, pursuant to the warrant, determines what is seized.

*Id.* By comparison:

> Service of a forthwith subpoena does not authorize an entry into a private residence. Furthermore, the person served determines whether he will surrender the items identified in the subpoena or challenge the validity of the subpoena prior to compliance.

*Id.* We concluded that "[t]hese differences are not eliminated by the fact that the search warrants and subpoenas were deliv-

ered at the same time" and observed that the complaining party had "failed to show that the papers that are described in the subpoenas are outside the scope of a legitimate investigation by the grand jury." *Id.* at 854-55. In addition, we specifically emphasized the fact that the defendant was given almost a month to comply with the subpoenas. *Id.* at 854.

**[28]** Therefore, the district court erred in finding the issuance of subpoenas and the contemporaneous execution of search warrants to be unreasonable. The Players' Association has not argued that the evidence sought by the subpoenas is "outside the scope of a legitimate investigation by the grand jury." *Id.* at 855. The subpoenas were not returnable on the same day that the search warrants were executed. As in *In re Grand Jury Subpoenas*, the return dates on the subpoenas were over a month from the date on which the warrants were executed. The district court declared the May 6 subpoenas an "unreasonable insurance" policy, but it failed to recognize the different purposes and requirements of the warrant as compared to the subpoena and the legitimate concern that production of relevant evidence to the grand jury would be unduly delayed. *See id.* at 854. It was error to conflate the two distinct tools. Insurance it may have been; but, under the Fourth Amendment, unreasonable it was not.

The district court also deemed the government's actions unreasonable because it found that the agents sought search warrants in three separate districts in an attempt to avoid a ruling on the motion to quash the existing subpoenas of January and March 2004. We note that granting the motion to quash would not have prevented the government from seeking the search warrants, particularly given the existence of probable cause. As the Fourth Circuit has noted, "the fact that a grand jury subpoena existed . . . at the time of the search obviously had no effect upon whether probable cause existed to search . . . for documents which were properly included within the warrant's scope." *United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 238 (4th Cir. 2001), *over-*

*ruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).

**[29]** As such, the district court rested its order on legally insufficient grounds, and abused its discretion in granting the motion to quash. *See United States v. Iverson*, 162 F.3d 1015, 1026 (9th Cir. 1998).

## VI

Finally, we address the Non-Party Journalist's Motion To Unseal, filed on November 23, 2005 by Joshua A. Gerstein. Gerstein seeks access to "the dockets for these appeals and the cases below, the district court opinions and/or orders that are the subject of these appeals, and all briefs filed with this Court."[49] We have jurisdiction over these documents, because the district courts' records transferred to us upon appeal. *See* Fed. R. App. P. 11.

Although not a party, Gerstein enjoys standing to file the motion based upon his constitutional interest in the proceedings:

> Under the first amendment, the press and the public have a presumed right of access to court proceedings and documents. . . . This presumed right can be overcome only by an overriding right or interest "based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."

---

[49]Oral proceedings before this court on November 15, 2005, were open to the public. On November 9, 2005, CDT and MLB filed an unopposed Motion To Seal Courtroom During Oral Argument. We denied the motion the next day. On November 14, 2005, CDT and MLB filed a Motion for Reconsideration of Motion To Seal Courtroom During Oral Argument, which the government joined. We denied the motion the same day.

*Oregonian Publ'g Co. v. District Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1985)).[50] The Supreme Court has noted the particular interest of media members in "publish[-ing] information concerning the operation of government." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).

To decide whether Gerstein's interest justifies unsealing portions of the records, the court also must consider the privacy interests of the litigants, for "the right to inspect and copy judicial records is not absolute." *Id.* In the appeals at bar, the records contain extremely sensitive information, especially the drug-testing records. If revealed, this information could adversely affect the reputations of many competitive baseball players. Therefore, the motion to unseal requires a careful balancing of the interests at stake. *See id.* (noting that access to judicial records may be limited to protect the privacy interests of the litigants, such as to avoid disclosure of "sources of business information that might harm a litigant's competitive standing").

Although we have jurisdiction to conduct a merits analysis of the motion to unseal, the district courts—having greater familiarity with the records[51] —are in a better position to balance the privacy interests and to determine which materials are protected grand jury materials. *See* Fed. R. Crim. P. 6(e).

---

[50]Gerstein premises his motion on Ninth Circuit Rule 27-13(c). That rule states: "During the pendency of an appeal, any party may file a motion with this court requesting that matters filed under seal either in the district court or in this court be unsealed. Any motion shall be served on all parties." *Id.* (emphasis added). Although Joshua Gerstein is not a "party" under this rule, his standing derives from his constitutional interest and does not depend upon the applicability of Ninth Circuit Rule 27-13(c).

[51]Sensitive portions of the records were neither revealed nor discussed at oral argument before this court. *See supra* note 49.

Therefore, we refer the Gerstein motion to the district courts for consideration upon remand.[52]

## VII

We now summarize the resolution of these consolidated appeals. We conclude that the government's seizures were reasonable under the Fourth Amendment, and that the district courts erred in ruling that Fed. R. Crim. P. 41(g) required return of all property and agent review notes unrelated to the ten expressly named Balco players.

At the same time, we recognize limits to the government's right to retain evidence seized, even where a broad seizure is reasonable in order to avoid lengthy and intrusive on-site inspection. Our Fourth Amendment precedents explain that the government may retain single "ledgers" of intermingled evidence, but may not keep separate, unrelated evidence. A magistrate is in the best position to sort through the actual evidence and to determine those files that may be kept when aggrieved parties seek relief. Readily separable evidence unrelated to persons named in the search warrants must be returned. The Fed. R. Crim. P. 41(g) cases must be remanded to the District of Nevada and Central District of California to permit such review of the sealed documents by magistrates.

With regard to the May 6 subpoenas, which covered the same evidence as the contemporaneous search warrants, we conclude the order of the Northern District of California quashing the subpoenas was an abuse of discretion. The record, illuminated by caselaw, reveals that the subpoenas were not unreasonable and did not constitute harassment.

---

[52]In the Central District of California and District of Nevada, the motion can be addressed during the remand pursuant to this opinion. *See infra* Section VII. The motion will need to be separately decided in the Northern District of California.

**[30]** Therefore, the orders of the Central District of California, the District of Nevada, and the Northern District of California cannot stand. The three cases consolidated in this appeal are hereby

**REVERSED in part** and **REMANDED in part.**

---

THOMAS, Circuit Judge, concurring in part and dissenting in part:

One of the three extremely able district court judges who rejected the government's argument summarized it best, stating: "What happened to the Fourth Amendment? Was it repealed somehow?"

Although it only had a search warrant for data concerning eleven Major League Baseball players, the government seized thousands of medical records and test results involving every single Major League Baseball player. The government did not stop there, seizing thousands of other medical records for individuals in thirteen other major sports organizations, three unaffiliated business entities, and three sports competitions. The government now seeks to retain all of the medical information it obtained about persons who were not the subject of any criminal inquiry.

The stakes in this case are high. The government claims the right to search—without warrant or even a suspicion of criminal activity—any patient's confidential medical record contained in a computer directory so long as it has a legitimate warrant or subpoena for any other individual patient's record that may be contained as part of data stored on the same computer. The government attempts to justify this novel theory on a breathtaking expansion of the "plain view" doctrine, which clearly has no application to intermingled private electronic data.

As radical as the government's position is, the majority goes even further. It holds that the government—without warrant or even a suspicion of criminal activity—may seize, retain, and view all confidential records in any electronic database on which private data responsive to a warrant resides. Under the majority's holding, a magistrate would be required to review the seized data for probable cause after seizure only if an aggrieved party made a motion. Even then, if the magistrate concluded that the irrelevant data was "comingled," the government would be entitled to retain the confidential medical records. This new theory was not argued by any party, nor presented to any district judge at any time during the course of these protracted and hotly contested proceedings.

The scope of the majority's new holding in the digital age could not be greater; it removes confidential electronic records from the protections of the Fourth Amendment. The holding also squarely conflicts with the sound and sensible procedural protections detailed in *United States v. Tamura*, 694 F.2d 591 (1982), which direct the government to seal and hold documents containing intermingled data pending approval of a magistrate of a further search.

I agree with the careful findings and conclusions of the three district judges who rejected the government's position. For that reason, and because of the profound consequences of the majority's opinion on the privacy of medical records throughout the United States, I respectfully dissent.

I

The investigation in this case ostensibly involved Bay Area Lab Co-Operative, popularly referenced as "Balco." The government suspected Balco of distributing illegal steroids to certain athletes, including some Major League Baseball players. The government knew that, pursuant to a collective bargaining agreement between the Major League Players Association

("Players Association" or "MLBPA") and Major League Baseball, confidential testing had been analyzed by Comprehensive Drug Testing, Inc. ("CDT"), and other laboratories, for the sole purpose of determining whether Major League Baseball should adopt an individualized steroid testing program.

Through the collective bargaining agreement, the players were assured that the testing would be anonymous and confidential, and that the samples and individual data would be destroyed upon tabulation of the results. The only object of the exercise was to determine the approximate magnitude of apparent steroid use with the goal of fashioning appropriate policies to address it. The collective bargaining agreement acknowledged and anticipated that the tests for some players might well yield positive results due to the ingestion of legal and proper over-the-counter supplements.

Although information developed by the government in its criminal investigation pointed only to specific individuals who might be involved with Balco, the government served a grand jury subpoena on CDT on January 16, 2004, seeking drug tests for all major league baseball players. After receiving the subpoena, the Players Association and CDT contacted the United States Attorneys' Office to discuss their concerns with the breadth of the subpoena. At the government's request, the Players Association, CDT, and Major League Baseball prepared and presented a "white paper" to the government detailing the provisions of the collective bargaining agreement pertaining to testing, with emphasis on the many confidentiality provisions, and raising concerns about the invasion of the constitutionally-protected privacy interests of the players who were not involved in the Balco investigation.

The Players Association and CDT assured the government in writing that CDT would maintain all of the subpoenaed records until the disputes were resolved by negotiation or litigation. On February 4, 2003, the Chief of the Criminal Divi-

sion wrote the counsel for CDT indicating that the government had accepted the assurances by CDT that none of the materials sought by the subpoena would be destroyed or altered pending the government's reconsideration of the subpoena and a motion to quash the subpoena, if filed.

On February 12, 2004, the grand jury returned a 42-count indictment against Victor Conte, Jr. (Balco's founder), James J. Valente (Balco's Vice President), Greg F. Anderson (a trainer), and Remi Korchemny (a track coach). The charges against the defendants included conspiracy to possess with intent to distribute anabolic steroids, possession with intent to distribute anabolic steroids, introduction and delivery of misbranded drugs into interstate commerce with intent to defraud, and misbranding of drugs held for sale with intent to defraud.

On March 3, the government served a second grand jury subpoena on CDT, seeking information on only eleven named baseball players. However, it did not withdraw the January 16 subpoena. On April 7, with no compromise reached and with a return date passed, the Players Association filed a motion in the Northern District of California in San Francisco to quash the CDT subpoena. The motion was assigned to Judge Jeffery S. White.

After learning that a motion to quash would be filed but before the motion could be heard, the government applied for a search warrant to search the CDT offices for the same information it was seeking in the grand jury subpoena. The search warrant application was made some 240 miles away in another federal judicial district, without notice to the Players Association or to the district court in the Northern District of California.

In the search warrant proceedings in the Central District of California, the government never brought to the magistrate judge's attention that there was a motion pending before Judge White in the Northern District of California to quash

the grand jury subpoena. The affidavit did not disclose that the Players Association had joined the motion. Rather, the affidavit stated:

> The referenced grand jury subpoena, for the items listed in Attachment B, was issued; however, while not denying that they have the requested materials, CDT has declined to comply with the subpoena and has stated its intent to attempt to quash the subpoena.[1]

The affidavit did not disclose that CDT had agreed in writing to keep the data and other materials secured until the scope of the grand jury subpoena was settled, either through negotiation or a ruling on a motion to quash. Rather, the affidavit justified removing computer data and equipment from the searched premises on the basis that the computer data could be concealed, altered, or destroyed by the user.

The affidavit also informed the magistrate judge that "[c]omputer hardware and storage devices may contain 'booby traps' that destroy or alter data if certain procedures are not scrupulously followed." It noted that computer data was "particularly vulnerable to inadvertent or intentional modification or destruction."

The government did not have any evidence or reason to believe that CDT had engaged in steganography, booby-trapping computers, or any type of data destruction or alter-

---

[1]Some months later, Judge Illston asked the government: "Did you explain to Judge Johnson what was happening before Judge White, even on the day that you got him to issue the warrant?" Government counsel replied, "We did inform Judge Johnson of the existence of the grand jury subpoena and it's in the warrant application of Judge Johnson that defense had indicated that it wanted to move to quash the subpoena. So we did indicate to Judge Johnson there was a disputed grand jury issue. Yes, it was disclosed to Judge Johnson." Neither the warrant application nor the affidavit filed in support of the application contain any reference to pending proceedings before Judge White.

ation. To the contrary, it had accepted in writing CDT's assurances "that CDT will maintain and preserve all materials called for by the first subpoena as well as any materials called for by the new subpoena" and that "CDT would not destroy or alter any of the materials called for by either of the subpoenas." However, the plain import of the application was that CDT was improperly resisting compliance with a valid grand jury subpoena and data was in jeopardy of being destroyed.

Based on the government's application, a search warrant was issued by Magistrate Judge Jeffery W. Johnson in the Central District of California in Los Angeles. The warrant authorized the seizure of records regarding drug specimens, testing, and test results of only ten specifically named Major League baseball players. The warrant also provided that if the computer data seized did not fall within any of the items to be seized or is not otherwise legally seized, the government would return the data. The affidavit provided by Special Agent Novitzky in support of the issuance of the warrants stated that obtaining information to link the test results to individual players was necessary "to ensure that samples of individuals not associated with Balco are left undisturbed."

The warrant was issued one day after the motion to quash the grand jury subpoena had been filed in the Northern District of California. Upon arrival at the premises of CDT on the morning of the search, Special Agent Novitzky and other agents discussed with CDT's attorney the need to search CDT's computers.

The information sought in the search warrant was contained in three places: a segregated list only containing information about the ten athletes that were subject of the search warrant; a master list of the drug test results for all Major League Baseball players; and a computer directory (often referred to as the "Tracey directory") that contained information and medical test results for hundreds of other baseball players and athletes engaged in professional sports. Counsel for CDT

requested that all material pertaining to the specific items listed in the warrant be reviewed and redacted by a magistrate judge or special master before it was seen by the government. The government refused the request.[2] The government also rejected CDT's offer to provide the records it had already segregated concerning the small subset of players at issue.

In addition to the segregated materials, the government seized the master list, the entire Tracey Directory (which consisted of more than 2,900 files), lists of teams and players and drug testing details, and eleven diskettes, all of which contained drug-test results on hundreds of Major League Baseball players and other athletes. The agents searching the Tracey directory at the scene concluded that certain of the subdirectories appeared to contain information not called for by the warrant. Rather than copying only the subdirectories that pertained to Major League Baseball, the agents copied the entire directory. In fact, the directory contained 2,911 files that had nothing to do with Major League Baseball drug testing, but rather contained test results for numerous other sports entities and business organizations. Dr. Jean Joseph of CDT later stated in an affidavit that the directory was easily searched by key word and would have provided the test information about the ten players in a short period of time.

Judge Cooper later specifically found that "[o]nce the items were seized the requirement of the search warrant that any seized items not covered by the warrant be first screened and segregated by computer personnel was completely ignored." She further found that Agent Novitzky himself reviewed the seized computer data and used what he learned to obtain the subsequent search warrants issued in the Northern District of California, the Central District of California, and Nevada.

---

[2]Department of Justice Guidelines provide that, in cases involving confidential patient information, a search warrant "shall be executed in such a manner as to minimize, to the greatest extent practicable, scrutiny of confidential materials." 28 C.F.R. § 59.4(b)(4).

After the initial search, and based on the search results, the government sought and obtained that day a second search warrant from Magistrate Judge Johnson for a search of a storage facility maintained by CDT.

On the same day, the government also applied for a search warrant in the District of Nevada. The warrant sought information in the business files of Quest Diagnostics, Inc., a laboratory that had also been involved in the administration of Major League Baseball's drug testing program in 2003. The warrant was limited to information concerning the ten baseball players identified in the Los Angles search warrant. The affidavit filed in support of the warrant did not disclose the history of the issuance of the grand jury subpoena or the filing of a motion to quash the subpoena. Based on the information provided by the government, Magistrate Judge Lawrence Leavitt issued the warrant, and the warrant was executed.

On April 9, 2004, the Players Association arranged an emergency hearing before Judge White, before whom the motion to quash the grand jury subpoena was pending. The Players Association sought an order restricting the government from disseminating any information it had obtained until the Players Association had an opportunity to litigate the motion to quash or a Rule 41 motion to return the seized property. The government argued that Judge White had no jurisdiction over the items seized pursuant to the search warrants, even though the grand jury subpoena sought the same materials.

The government represented to the court that it would not disseminate the information and would negotiate in good faith about the seized items. Judge White accepted that representation. He noted that he did not have jurisdiction over the items seized pursuant to the warrants, but that the motions to quash the grand jury subpoenas remained pending before him. Judge White acknowledged that the position of the Players Association was "well taken with respect to the U.S. Attorney's man-

ual and the government allegedly not following proper procedure," but that the Players Association had other available remedies to resolve that issue on the merits.

On April 22, 2004, the government wrote CDT indicating that it was withdrawing the January 16, 2004, subpoena and modifying the subpoena of March 3, 2004. The government did not inform Judge White of these actions and the January 16 subpoena was never withdrawn.

On April 24, CDT and the Players Association filed a motion in the Central District of California for return of the seized property or, in the alternative, appointment of a special master to redact those records so that the government retained drug test results for only the ten players named in the warrant.

On April 30, 2004, the government filed its opposition to the motion to return property in the Central District. In its opposition, despite the existence of an agreement with CDT that CDT would not destroy or alter documents, the government argued that it "had good-faith reasons to believe that CDT was detrimentally delaying the investigation, and that there was some danger of the sought-after records being jeopardized." The government also argued that this jeopardy justified proceeding with a search warrant under DOJ guidelines.

On the same date, April 30, 2004, based on what it had found in the first search, the government sought a new search warrant in the Northern District of California in San Jose for CDT electronic files it already had in its possession in the Tracey Directory concerning all players whose test results were positive.

In contrast to the affidavit supplied in the first warrant application, which purported to "to ensure that samples of individuals not associated with Balco are left undisturbed," the affidavit of Agent Novitzky in support of this warrant application sought "authorization to conduct a thorough

review of all major league baseball-related computer data" and "to seize all data pertaining to illegal drug use by any member of major league baseball."

**Volume 2 of 2**

The affidavit conceded that no specific information had been uncovered linking Balco to any individual baseball players beyond the ten listed in the April 7, 2004, search warrant. However, in contrast to the first warrant application, Agent Novitzky averred that even though there was no evidence that had been developed to link the ballplayers who were not listed in the first warrant to Balco, "it is logical to assume that a review of the drug testing records for other players may provide additional evidence of the use of similar illegal

performance-enhancing drugs which establishes a link to the charged defendants in the charged [Balco] case, given the relatively small number of professional baseball players and the closely-knit professional baseball community."

The affidavit in support of issuance of the warrant did not disclose that a grand jury subpoena had been issued for the same material and that a motion to quash the subpoena was pending in the very same district.

The affidavit also did not disclose that the parties were litigating in the Central District of California a motion for return of the seized property — the very property which was subject of the new search warrant request. Based on the information provided by the government, Magistrate Judge Howard W. Lloyd issued a new search warrant for the same material that the government had already searched and seized.

On May 5, 2004, the government sought a search warrant in the District of Nevada for information contained in the files at Quest Diagnostics concerning all baseball players who, according to the information collected in the CDT search, had tested positive for steroids. The application conceded that there was no specific evidence linking these players to Balco. The warrant was issued by Magistrate Judge Leavitt. A large number of physical samples of bodily fluids were taken (later reported by the government to be 250 to 300 because of multiple samples given by the players), which the government transported to a lab in Los Angeles.

On May 5, 2004, the government sought a search warrant in the Central District of California in Los Angeles before a different magistrate judge for all information contained in the files at CDT concerning all baseball players who, according to the information collected in the CDT search, had a positive marker for steroids. The application conceded that there was no specific evidence linking these players to Balco. Neither the application nor the affidavit filed in support of the applica-

tion disclosed the pending proceedings concerning the grand jury subpoenas. Based on the information provided by the government, the warrant was issued by Magistrate Judge Rosalyn Chapman.

On May 6, 2004, after it had executed the search warrants, the government served grand jury subpoenas on CDT and Quest for the same materials it had sought in the April 30 and May 5 search warrants. The subpoena contained the names of the baseball players that had allegedly tested positive, even though the government knew that the information Quest possessed was only identifiable by number and even though the government had assured the Players Association and Judge White that it would not disclose the names. The government sent a letter to Quest Diagnostics instructing the company not to disclose to anyone the government's request for documents "indefinitely" because "[a]ny such disclosure could impede the investigation being conducted and thereby interfere with the enforcement of the law."

On May 21, 2004, CDT and the Players Association filed a motion in the District of Nevada for a return of the property seized from Quest Diagnostics. On June 7, 2004, CDT and the Players Association filed a motion in the Northern District of California for return of the electronic documents seized from CDT pursuant to the April 30 search warrant issued by Magistrate Judge Lloyd in the Northern District.

On July 9, 2004, Judge White held a hearing on the motion to quash the grand jury subpoenas, but deferred action pending rulings on the motions for return of property seized pursuant to the search warrants.

On August 9, 2004, Judge Susan Illston held a hearing on the motion for return of the electronic data seized by the government pursuant to the April 30 warrant. When asked by Judge Illston why the government hadn't just waited to let Judge White rule on the motions to quash the grand jury sub-

poena rather than seeking search warrants for the same mate-
rial, the government responded:

> What the government really perceived ultimately as
> a conscious decision on the part of the Major League
> Baseball Players Association and the other parties
> associated with it just refused to comply with what
> the government felt was [sic] legitimate grand jury
> subpoenas.

Later in the hearing the government argued that the search
warrant was necessary because a motion to quash had been
filed.

> Counsel: The concern here was, to say, okay, we're
> going to face a brick wall from this legal
> avenue . . . .
>
> Judge:    What brick wall?
>
> Counsel: The brick wall was . . .
>
> Judge:    Judge White?
>
> Counsel: No, no, not at all. It was the concern that
> the requests or that discussions about
> moving to quash the subpoena would be
> something that would be dragged out.

At a later hearing, counsel for government confirmed that
it would not have sought to obtain the search warrants if the
affected parties had not filed a motion to quash the grand jury
subpoena.[3] However, the Department of Justice Guidelines

---

[3]A hearing on December 10, 2004, discussed *infra*, contains this collo-
quy:

> Counsel:    And the government never would have done the
> search warrants if the grand jury process could have

provide that "The fact that the disinterested third party possessing the materials may have grounds to challenge a subpoena or other legal process is not in itself a legitimate basis for the use of a search warrant." 28 C.F.R. § 59.4.

The government primarily argued that, even though the material seized may not have been authorized under the search warrant, seizure was appropriate under the "plain view" doctrine. The court engaged in an extensive colloquy about the search, ascertaining that the data was contained in a file that could not be accessed readily without assistance, and that the agent had to scroll through 1,200 results to obtain the positive tests that formed the basis of the later search warrants. After noting that the government had not provided any case to support its contention that the plain view doctrine applied in the computer context, Judge Illston made the following findings:

> I find absolutely staggering the implications about what you say about the plain view doctrine in the computer set up. In a way nothing is in plain view because with the disk you look at it, you don't see anything until you stick it in the computer and it does take quite a lot of work really to bring it up on the screen.

---

|  |  |
|---|---|
|  | worked out. But it didn't. I feel — |
| Court: | Say that last thing one more time. What you — |
| Counsel: | What I just said was we may not have ever done the search warrants if the subpoena process worked out. |
| Court: | But, I mean, there was a subpoena process pending in this building before Judge White. |
| Counsel: | Yes. |
| Court: | At the time you went and got your search warrants, and you didn't allow that process to complete itself. |
| Counsel: | That is true. |

So, it's not in plain view in the sense of walking into the room and seeing the scale on the desk. It takes a whole lot of work to get there.

First off, none of it is cursory, there are whole industries that have developed in order to make it possible for the disk to show up on the screen that way. So it's not cursory review. I don't think it's plain view. I don't think I have to go that far or make that kind of choice with respect to issues that are certainly going to arise. . . . Where it requires sorting through information which really is on a data base, somehow it's being organized in different formats, you could organize it in a format based on the ten names, instead of taking it in other kinds of formats, then scrolling across and taking names and information off the screen, when it's clearly information that isn't part of what was originally within the authorized search warrant, I just think is impermissible.

Judge Illston then granted the motion for return of seized property, with the following findings from the bench:

So, having looked at the *Ramsden* factors set out, [there are] apparently four factors. One, whether the government displayed a callous disregard for the constitutional rights, two, whether the [movant] has an individual right and need for the property he wants returned, three, whether the [movant] would be irreparably injured by denying the motion for return of property, and four, whether the [movant] has an adequate remedy at law for a redress of his grievance. I find all four factors have been met here.

I think the government has displayed, in the chronology of things that we've seen, in the way that the case was taken from one judge to another judge, in the way that as soon as it was challenged in one

court, it was immediately litigated in another court without full information being shared among the courts, that to me makes it a callous disregard for constitutional rights. I think, it's a seizure beyond what was authorized by the search warrant, therefore it violates the Fourth Amendment.

Number two, I think [that both movants] here have an interest and need for the property returned. I think they need it returned and not so much because they need it back, they got it, you got it, I think what they need to get back from you what they have, what you've taken from them because of the privacy rights and the circumstances under which this material was given.

Whether the [movant] would be irreparably injured by denying the return of the property, I think they would, and I think indeed there would be, that the injury that will be suffered by volunteers not being able to confidently provide testing under promise of privacy would irreparably injure not only major league baseball, I can't imagine that there's going to be any voluntary agreement to do this kind of testing, that's probably over with already, but also just has implications that are very negative for these [movants], and whether the [movant] has an adequate remedy at law, I don't think there is any remedy at law for the redress of these grievances.

I'm going to grant the motion.

On August 13, in the Central District of California, Magistrate Judge Johnson issued a report and recommendation recommending denial of the motion for return of property seized at CDT.

On August 19, in the District of Nevada, Judge James C. Mahan held a hearing on the motion filed by the Players

Association for the return of the property seized at Quest Diagnostics pursuant to the search warrants. The government did not disclose to Judge Mahan or the Players Association that it had served on Quest a grand jury subpoena for the same materials, coupled with a letter instructing Quest to keep that fact confidential indefinitely. At the conclusion of the hearing, Judge Mahan orally granted the motion. On September 7, Judge Mahan filed a written order granting the motion for return of the property. Judge Mahan found, in relevant part, that:

2.    Under *Ramsden v. United States*, 2 F.3d 322 (9th Cir. 1993), this Court has equitable jurisdiction to order return of that seized property. All of the factors identified in *Ramsden* supporting jurisdiction are present. The government callously disregarded the affected players' constitutional rights. The MLBPA, as representative for the players, has an individual interest in and need for the property that it wants returned. The MLBPA would be irreparably injured if the property were not returned. And the MLBPA has no adequate remedy at law for redress of the grievances.

3.    Under the particular circumstances of this case, it was unreasonable for the Government to refuse to follow the procedures set forth in *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), upon learning that drug-testing records for the ten athletes named in the original April 8 warrants executed at Quest and at Comprehensive Drug Testing, Inc. were co-mingled with records for other athletes not named in those warrants.

After issuance of the order, the government declined to return the material seized from Quest in Nevada, contending

it was entitled to retain it under the authority of the new May 6 grand jury subpoena. To that end, the government filed a stay motion with Judge Mahan, arguing that it had a right to retain the data and samples based on the May 6 grand jury subpoena, which had issued after the seizures of the material had occurred. The government argued that Judge White was the only judge who had jurisdiction to decide that issue. Judge Mahan denied the stay motion. The government maintained that the May 6 grand jury subpoenas independently authorized retention of the data and specimens; therefore, the Players Association and CDT filed a motion to quash the May 6 subpoena in the Northern District of California.

On October 1, 2004, in the Central District of California, Judge Cooper declined to adopt Magistrate Judge Johnson's recommendation, and granted the motion for return of the seized CDT property. She noted that she joined "an apparently ever increasing number of district judges who have held that the Government's execution of the Search Warrant at issue in this case demonstrated a callous disregard for the constitutional rights of the movants and their members."

With respect to the *Ramsden* factors, Judge Cooper found:

> All four considerations weigh in favor of the moving parties in this case. In assessing whether the government displayed a callous disregard for the rights of the persons whose records were seized, it is important to focus on the Ninth Circuit opinion in *United States v. Tamura*, 694 F.2d 591 (1982). At the time of the search, *Tamura* was certainly settled law in the Circuit, and *Tamura* establishes a procedure to be followed when documents to be seized are intermingled with other documents. ". . . . [T]he wholesale *seizure* for later detained examination of records not described in a warrant is significantly more intrusive, and has been characterized as 'the kind of investigatory dragnet that the fourth amend-

ment was designed to prevent.'[citation]." *Id.* at 595. Therefore, law enforcement officials are to seal and hold such intermingled documents "pending approval by a magistrate of a further search . . . . Wholesale removal must be monitored by the judgment of a neutral, detached magistrate." *Id.* at 596. It is particularly telling in this case that just such a procedure was proposed to the Government at the time of the search, and rejected.

Nor is the viewing of the seized files legitimized by the Plain View doctrine. Under the exception to the warrant requirement, an officer may seize what he plainly views, so long as he has a lawful right to access the evidence itself and its incriminating character is immediately apparent. *Horton v. California*, 496 U.S. 128, 136 (1990). Here, the agent did not have a lawful right to access the computer records and diskettes, and, as evidence provided in connection with the Motion reveals, the evidence observed is not necessarily incriminating. The Declaration of Dr. Joseph states that the ingestion of nutritional supplements can produce a "positive" test for steroids.

The Government demonstrated a callous disregard for the rights of persons whose records were seized and searched outside the warrants.

The second consideration, whether the moving party has an interest and need for return of the property, is easily answered. The athletes in question voluntarily submitted to urine testing for steroids, as part of an agreement that all results would remain confidential and be used only for statistical analysis. Their interest in privacy is obvious.

The third consideration, whether the moving party has an interest and need for return of the property is

easily answered. The careers of these athletes could be profoundly, negatively affected by release of these records, and their return is vitally important. The harm they would suffer if the records were released (even if the positive tests are shown to be innocuous) would be irreparable.

Finally, it is evident that the movants have no other legal remedy. No motion to suppress the evidence is available to them; they are neither defendants nor suspects, and no case exists in which this issue could be litigated.

In addition to her findings and conclusions, Judge Cooper added these comments in a section labeled "Serious Concerns:"

The documents presented to the Court in connection with this Motion reveal extremely troubling conduct on the part of the Government. The picture painted is one of almost desperate effort to acquire evidence by whatever means could be utilized. The Government negotiated with movants' attorneys over the breadth of the grand jury subpoenas; received assurances in writing that the records of the ten athletes would be secured while the Court resolved the issue, and the day after the issue was presented to a Court, went to another district and sought a search warrant. That conduct would be suspect in itself. But in seeking the warrant (not the correct procedure for obtaining documents for a third party who is not a suspect), the Government explained to the Magistrate that the records in question were in danger of being destroyed. This is blatant misrepresentation, as demonstrated by the records in this case.

Four days after Movants filed a motion before Magistrate Judge Johnson for return of the property,

the Government obtained a further warrant from a Magistrate Judge in the Northern District of California. And while a motion for return of *that* property was pending, the Government obtained two more warrants in the Central District of California (not from Magistrate Judge Johnson) and in Nevada. The image of quickly and skillfully moving the cup so no one can find the pea would be humorous if the matter were not so serious.

Noting that "the Government is held to a far higher standard than has been demonstrated in this case," and that "this is the third District Court Order compelling the Government to return property illegally seized," Judge Cooper ordered return of the seized CDT property forthwith.

On December 10, 2004, Judge Illston held a hearing on the Players Association motion to intervene and to quash the May 6, 2004 grand jury subpoenas served on CDT and Quest. At the conclusion of the hearing, Judge Illston made the following oral findings and conclusions:

> I find that the MLBPA has the right to intervene in this matter under Federal Rule of Civil Procedure 24(a), as it has an interest in the samples and test results in the possession of CDT and Quest, which were created with the promise of anonymity under the mandatory testing of the 2002 collective bargaining agreement.

> The May 6th, 2004 subpoenas were the culmination of a series of actions taken by the government in order to prevent MLBPA and CDT's attempt to move to quash the January and March subpoenas. Instead of allowing the matter to be resolved in a single proceeding before Judge White, the government executed a series of search warrants in three different

districts once it learned that petitioners would move to quash the January and March subpoenas.

The government has provided no substantial explanation of why this course of action was necessary. Given that the government had no other basis for issuing the April search warrants and preempting the subpoenas served of Quest and CDT, the decision appears to have been a tactical decision to prevent the parties from raising objections before Judge White, which is unreasonable and constitutes harassment similar to the conduct in *United States v. American Honda*.

Furthermore, the May 6th subpoenas were served after the government had obtained evidence pursuant to the April 7 and April 30 search warrants, which has now been determined to have been illegally seized. Some of the information sought in the May 6th subpoena was already in the government's possession at the time the subpoena was served on CDT and Quest; therefore, the Court finds that the May 6th subpoena served as an unreasonable insurance policy as recognized in the motion for the return of seized property cited in the papers, 681 F.Supp. [sic]

For these reasons the court grants petitioner's motion to quash the May 6th subpoena served on Quest and CDT as an abuse of the grand jury process and unreasonable under Federal Rule of Criminal Procedure 17(c).

On October 18, 2005, as a result of a plea agreement, Balco founder Victor Conte received a sentence of eight months imprisonment, with four months of the sentence to be served in home confinement. James Valente, Balco's vice president, was sentenced to probation. Trainer Greg Anderson was sentenced to six months imprisonment, with three of the six

months to be spent in home confinement. On February 25, 2006, track coach Remi Korchemny was sentenced to one year of probation.

In reviewing both the order quashing the grand jury subpoena and the orders granting the motions for return of property pursuant to Fed. R. Crim. P. 41(g), we review the factual findings of the district courts for clear error. *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 854 (9th Cir. 1991) (orders to quash grand jury subpoenas); *United States v. Marolf*, 173 F.3d 1213, 1216 (9th Cir. 1999) (orders on motions for return of property). We review orders quashing subpoenas for abuse of discretion. *United States v. Bergeson*, 425 F.3d 1221, 1224 (9th Cir. 2005) (citing *In re Grand Jury Subpoena*, 357 F.3d 900, 906 (9th Cir. 2004)). We review *de novo* a district court's denial of a motion for return of property pursuant to Rule 41(g). *Marolf*, 173 F.3d at 1216.

II

There are two preliminary jurisdictional questions: (1) whether the Players Association had standing to file the Fed. R. Civ. P. 41(g) motions for return of property on behalf of its members, and (2) whether the government timely appealed Judge Cooper's order granting the Rule 41(g) motion.

I agree with the majority that the Players Association had organizational standing to file the Rule 41(g) motion for return of the records and specimens seized from Quest. For the same reasons—although the majority does not reach this issue—I would also hold that the Players Association had organizational standing to file the Rule 41(g) motion for return of the property seized from CDT.

However, I respectfully disagree that the government timely appealed Judge Cooper's order granting the motion for return of property.

A

It is undisputed that the government's notice of appeal was filed more than sixty days after judgment was entered which, in the ordinary course, would make the appeal untimely. Fed. R. App. P. 4(a)(1)(B).[4] "A timely appeal is required to vest this court with jurisdiction." *Fiester v. Turner*, 783 F.2d 1474, 1475 (9th Cir. 1986). The Players Association contends that we lack jurisdiction due to the government's untimely filing. The government contends that the time for filing an appeal was tolled by its filing of a "Motion for Reconsideration" with the district court.

The Federal Rules of Civil Procedure do not provide for "Motions for Reconsideration." Rather, such motions are creatures of local rule or practice. In this case, the government's motion was filed pursuant to Local Rule 7-18 of the Central District of California. Federal Rule of Civil Procedure 83 authorizes district courts to make rules governing their own practices so long as they are "not inconsistent with [the Federal Rules]." Where a conflict arises between the two, federal rules must prevail. *Colgrove v. Battin*, 413 U.S. 149, 161 n.18 (1973); *see also Loya v. Desert Sands Unified Sch. Dist.*, 721 F.2d 279, 280 (9th Cir. 1983); 28 U.S.C.A. § 2071(a) (providing that rules adopted by district courts must be consistent with the federal rules of procedure).

Thus, when faced with a motion for reconsideration under local rules, we must either harmonize the rule, or reject it as in conflict with the national uniform rules. *See Marshall v. Gates*, 44 F.3d 722, 725 (9th Cir. 1995) ("We are, however, under an obligation to construe local rules so that they do not conflict with the federal rules, and we have exercised our ingenuity in doing so.")

---

[4]The judgment was filed October 10, 2004. The Notice of Appeal was filed March 9, 2005.

For the purposes of appeal, when a local rule based post-judgment motion for reconsideration is made premised on an argument that there was a "manifest showing . . . of a failure to consider material facts," we construe it either as (1) a motion to alter or amend a judgment under Rule 59(e) or (2) a motion filed under 60(b) for relief from judgment under Rule 59(e). *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1441-42 (9th Cir. 1991).[5] Whether we construe the motion as filed under Rule 59(e) or Rule 60(b) depends on the timing. *Am. Ironworks & Erectors Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892, 898-99 (9th Cir. 2001). If the motion for reconsideration is filed within ten days of the entry of judgment, we construe it as filed under Rule 59(e). *Shapiro ex rel. Shapiro v. Paradise Valley Unified School Dist. No. 69*, 374 F.3d 857, 863 (9th Cir. 2004); *Am. Ironworks*, 248 F.3d at 898-99; *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992). This construction is in accord with Rule 59(e), which provides that a motion to alter or amend the judgment "shall be filed no later than 10 days after entry of the judgment." Fed. R. Civ. Pro. 59(e).

If the motion is filed more than ten days after entry of judgment, we construe it as being filed under Rule 60(b). *Am. Ironworks*, 248 F.3d at 899; *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1463 n.35 (9th Cir. 1992); *Straw v.*

---

[5]The majority admits that the government's motion was made "precisely on these grounds," but contends that a motion on these grounds does not conflict with either Federal Rule 59(e) or 60(b). That conclusion is squarely precluded by a long line of precedent, as I have cited, in which we have held that a local-rule based motion on those grounds is to be construed under one of the two Federal Rules. *Fuller*, 950 F.2d at 1442; *Schroeder v. McDonald*, 55 F.3d 454, 459 (9th Cir. 1995). *Fuller* itself involved the local rule of the Central District of California governing motions for reconsideration—the precise rule at issue here. A contrary rule would not make any sense and would leave the critical question of appellate jurisdiction to the whim of local rule. We have to determine as a matter of appellate jurisdiction whether the appeal is timely under the Federal Rules of Appellate Procedure.

*Bowen*, 866 F.2d 1167, 1171-72 (9th Cir. 1989); *Gould v. Mutual Life Ins. Co. of New York*, 790 F.2d 769, 772 (9th Cir. 1986),

The difference between the rules is important. A timely filed motion pursuant to Rule 59(e) will toll the time for filing a notice of appeal from the underlying judgment until the district court denies the Rule 59(e) motion. *Shapiro*, 374 F.3d at 863. However, the filing of an untimely Rule 59(e) motion does not toll the running of the appeal period. *Scott v. Younger*, 739 F.2d 1464, 1467 (9th Cir. 1984) (citing *Cel-A-Pak v. California Agric. Labor Relations Bd.*, 680 F.2d 664, 666 (9th Cir. 1982)). The ten day time limit in Rule 59(e) "is jurisdictional and cannot be extended by the court." *Id.* Indeed, Federal Rule of Civil Procedure 6(b), which allows for enlargement of time to file, states that a court "may not extend the time for taking any action under . . . [59(e)] . . . , except to the extent and under the conditions stated [in the section itself]." Fed. R. Civ. Pro. 6(b).

The filing of a Rule 60(b) does not toll the time for appealing from the underlying judgment. *Nutri-Cology*, 982 F.2d at 397. Therefore, unlike an appeal from a denial of a Rule 59(e) motion, " '[a]n appeal from a denial of a Rule 60(b) motion brings up only the denial of the motion for review, not the merits of the underlying judgment.' " *Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 380 (9th Cir. 1997) (quoting *Floyd v. Laws*, 929 F.2d 1390, 1400 (9th Cir. 1991)); *see also Molloy v. Wilson*, 878 F.2d 313, 315 (9th Cir. 1989); *Straw v. Bowen*, 866 F.2d at 1171; *Schanen v. United States Dept. of Justice*, 762 F.2d 805, 807 (9th Cir. 1985), *as modified*, 798 F.2d 348 (1986).

Here, it is undisputed that the government's post-judgment motion for reconsideration of the order was not timely filed. Judge Cooper filed the order on October 1, 2004; the government did not file its motion to reconsider until November 23, 2004. Because the government's motion to reconsider was

filed outside the ten day time limit specified in Rule 59(e), we must construe the motion as filed under Rule 60(b). *Am. Ironworks*, 248 F.3d at 899; *Mt. Graham Red Squirrel*, 954 F.2d at 1463 n.35.

For these reasons, I disagree with the analysis offered by the parties and by the majority. The government's argument that "courts liberally construe post-judgment motions as adequate to toll the time for filing a notice of appeal" is squarely foreclosed by circuit law under these circumstances. The cases cited by the government pertain only to motions timely filed within the ten day period described in Rule 59(e), not to motions filed outside the ten day window. *See, e.g.*, *Taylor v. Knapp*, 871 F.2d 803, 805 (9th Cir. 1988) (construing a variety of post judgment motions as filed under Rule 50(e) so long as the motions were filed within ten days after the order or judgment).

Although I agree with the Players Association that we lack jurisdiction over the merits of Judge Cooper's original Rule 41(g) order, I disagree that we lack jurisdiction over Judge Cooper's denial of the motion for reconsideration. The government's notice of appeal was filed within sixty days after the denial, so the appeal is timely as to the motion for reconsideration.

I respectfully, but strongly, disagree with the majority that the Central District's local rule served to override the Federal Rules of Civil Procedure or our prior controlling precedent, which requires post-judgment motions to be filed within ten days of the order or judgment in order to toll the time for filing a notice of appeal. *Nutri-Cology*, 982 F.2d at 397. The time limits established for filing an appeal are "mandatory and jurisdictional." *Browder v. Director, Dept. of Corrections of Illinois*, 434 U.S. 257, 264 (1978). The majority's contrary view, as I have explained, is contrary to the plain language of Rule 83, 28 U.S.C. § 2071(a), and controlling precedent.

To summarize: Consistent with our precedent and the rules, I would hold that the government's untimely motion for reconsideration should be construed as a Rule 60(b) motion. Because the government did not file a notice of appeal of the original order within the period required by Rule 4(a)(1)(B), we lack jurisdiction to consider the merits of the original order. I would hold that we have jurisdiction to consider the district court's denial of the motion for reconsideration, but our review is confined to it.

B

We review the denial of a motion for reconsideration construed as a Rule 60(b) motion for an abuse of discretion, *Sch. Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993), and we will reverse a district court's ruling on a Rule 60(b) motion " 'only upon a clear showing of abuse of discretion.' " *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985) (quoting *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks*, 685 F.2d 1065, 1071 (9th Cir. 1982)). Therefore, our review is confined to whether Judge Cooper abused her discretion in denying the government's motion for reconsideration and does not extend to the merits of the underlying order.

When we review a motion for reconsideration under Rule 60(b), we analyze the district court's decision under the usual Rule 60(b) factors, "which provide[ ] for reconsideration only upon a showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) avoid judgment; (5) a satisfied or discharged judgment; or (6) 'extraordinary circumstances' which would justify relief." *Fuller*, 950 F.2d at 1442. In its reconsideration motion, the government did not contend there was any mistake, surprise, excusable neglect, newly discovered evidence, fraud, void judgment, satisfied or discharged judgment, or extraordinary circumstances. Rather, the government simply asked the district court to modify its finding, suggesting that the court had failed to consider evi-

dence already in the record. A district court does not abuse its discretion in denying a Rule 60(b) motion when it simply repeats its earlier arguments. *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985).

In response to the government's motion, the district court examined each of the government's assertions that the court had ignored evidence and arguments. In its order denying reconsideration, the district court carefully explained how it had considered the evidence and arguments in the first instance, but found them unconvincing. As the district court properly concluded, the motion for reconsideration amounted only to "[t]he Government's mere disagreement with the Court's interpretation of the evidence and its opinions . . . ." Under these circumstances, the district court certainly did not abuse its discretion in denying the government's motion.[6] I would affirm the order of the district court denying the government's motion for reconsideration.

### III

I agree with the majority that the district courts properly exercised equitable jurisdiction over the Rule 41(g) motions.[7]

---

[6]The local rule under which the motion was filed contains similar restrictions to those contained in Rule 60(b). It provides that "[a] motion for reconsideration on any motion may be made only on the grounds of (a) a material difference in law or fact from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material factors or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision." Local Rule 7-18. Clearly, the government offered no new evidence that was not available to it at the time the motion was made and no suggestion of a change in law. Its only argument was that the district court failed to consider material facts already presented, a contention that the district court squarely addressed in its order.

[7]For the purposes of this section, I will analyze Judge Cooper's order granting Rule 41(g) relief on the merits along with Judge Mahan's similar order, even though I believe that we lack jurisdiction to consider the merits of Judge Cooper's original order as I explained in Section II.

*Ramsden* identified four factors that district courts must consider before exercising equitable jurisdiction to order the return of property, namely whether: (1) the government displayed a callous disregard for the constitutional rights of the movant; (2) the movant has an individual interest in and the need for the property he wants returned; (3) the movant would be irreparably injured by denying return of the property; and (4) the movant has an adequate remedy at law for the redress of his grievance. 2 F.3d at 324.

Although I agree with the majority that the district courts properly exercised equitable jurisdiction, I disagree with the majority's analysis in reaching that conclusion. Because the equitable jurisdictional analysis in large part drives the analysis of the merits of the Rule 41(g) decisions, it is important to detail my differences with the majority on the issue.

A

The first *Ramsden* factor is whether the government displayed a callous disregard for the constitutional rights of the movant. The majority concludes the government did not. I respectfully disagree with that conclusion. The record amply supports the conclusion of the district courts that the government displayed callous disregard for the constitutional rights of the movants.

1

The district judges concluded, among other things, that the government sought and executed the search warrants and took subsequent legal action as a tactical measure to prevent the Players Association and CDT from litigating their motion to quash and other objections to the wholesale production of CDT data. The record supports this conclusion. The government applied for, and executed, the initial search warrants after CDT and the Players Association informed the government it would be filing a motion to quash the grand jury sub-

poenas. Government counsel conceded on the record that the motivation for seeking the search warrants was the "brick wall" presented by the filing of the motions to quash, even though DOJ guidelines state that "[t]he fact that the disinterested third party possessing the materials may have grounds to challenge a subpoena or other legal process is not in itself a legitimate basis for the use of a search warrant." 28 C.F.R. § 59.4.

The majority repeatedly points out that the DOJ guidelines do not give rise to substantive rights. That may be so, but it is beside the point. The guidelines form a baseline from which to judge the reasonableness of unjustified deviations from the standard practices they outline. The guidelines plainly state that it is not legitimate to use a search warrant because a party may be challenging a subpoena; the government admitted that this was precisely the reason it issued the warrants in this case.

Further, as Judge Cooper found, the use of a search warrant to obtain documents from a third party is inappropriate. The Department of Justice Guidelines address this point specifically:

> A search warrant should not be used to obtain documentary materials believed to be in the private possession of a disinterested third party unless it appears that the use of a subpoena, summons, request, or other less intrusive alternative means of obtaining the materials would substantially jeopardize the availability or usefulness of the materials sought, and the application for the warrant has been authorized as provided in paragraph (a)(2) of this section.

28 C.F.R. § 59.4(a)(1); *see also* U.S. Attorney's Manual § 9-19.210.

The U.S. Attorney's Manual also provides that a search warrant should normally not be used to obtain confidential materials such as treatment records. §§ 9-19.220, 9-19.230.

The simple and undisputed fact is that the government deviated from its usual and appropriate protocol. Documents held in the possession of third parties are appropriately obtained through use of grand jury subpoena, not search warrant. The record is quite clear that the government used the vehicle of a search warrant only because it thought its grand jury subpoenas might be contested. As the DOJ Guidelines recognize, that is an inappropriate use of a search warrant. The district judges were entitled on the basis of the record to find that the government undertook this action in an attempt to prevent the Players Association and CDT from litigating the merits of their objections to the grand jury subpoenas.

Further, the entire record of the case shows a repeated pattern of the government attempting to prevent a full hearing on the merits of the Players Association legal challenges. In virtually each hearing in which CDT and the Players Association articulated their objections, the government argued that another court had primary jurisdiction or that the action of another court dictated the result.[8] The record supports the district courts' collective conclusion that, as Judge Cooper put it, the government's actions constituted a "desperate effort to

---

[8]To provide but a few examples: Before Judge White, who was considering the initial motion to quash, the government argued that he should defer ruling because he had no jurisdiction over the materials seized by the warrant. The government urged Judge Illston to wait to decide the Rule 41(g) motion until Magistrate Judge Johnson had ruled on the separate Rule 41(g) motion. The government urged Judge Johnson to consider that probable cause had already been established by the issuance of a search warrant by Magistrate Judge Lloyd. The government contended Judge Mahan lacked jurisdiction to order the property seized under the warrant returned because it had separately obtained a grand jury subpoena for the same item, urging him to wait until Judge White had ruled on the motion to quash (not disclosing that it had asked Judge White to defer until the Rule 41(g) motions had been decided).

acquire evidence by whatever means could be utilized," by means of "quickly and skillfully moving the cup so no one can find the pea."

2

The record also amply supports the conclusion of the district courts that the government made misleading statements in its application for search warrants.

The application contained lengthy representations about how computer data could be destroyed and stated that "while not denying that they have the requested materials, CDT has declined to comply with the subpoena and has stated its intent to quash the subpoena." The affidavit did not disclose that CDT had agreed in writing to keep the data and other materials secured until the scope of the grand jury subpoena was settled, either through negotiation or a ruling on a motion to quash. The affidavit did not disclose that the Chief of the Criminal Division of the United States Attorney's Office had accepted the assurances in writing.

Rather, the affidavit justified removing computer data and equipment from the searched premises on the basis that:

> Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. . . . Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image

file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

The affidavit also informed the magistrate judge that "[c]omputer hardware and storage devices may contain 'booby traps' that destroy or alter data if certain procedures are not scrupulously followed." It noted that computer data was "particularly vulnerable to inadvertent or intentional modification or destruction."

The government did not have any evidence or reason to believe that CDT had engaged in steganography, booby-trapping computers, or any type of data destruction or alteration. To the contrary, it had accepted in writing CDT's assurances "that CDT will maintain and preserve all materials called for by the first subpoena as well as any materials called for by the new subpoena" and that "CDT would not destroy or alter any of the materials called for by either of the subpoenas." The plain import of the application was that CDT was improperly resisting compliance with a valid grand jury subpoena and data was in jeopardy of being destroyed. It implied that CDT was not being forthright about the information it possessed, when in fact there was no suggestion that CDT was attempting to mislead the government in any respect.

The search warrant application did not disclose that the Players Association, on behalf of the individuals whose medical files were at issue, had intervened and had joined CDT's motion to quash the grand jury subpoena. The application did not disclose the history of negotiations between the parties, and that the concern was about the breadth of the subpoena. The application did not disclose that the written assurances made by CDT and accepted by the government contemplated resolving the disputed issues through a motion to quash if necessary. Rather, the application implied that CDT was taking unjustified unilateral action.

Given these undisputed facts, the district judges were entitled to find that the government had made misleading statements in the search warrant applications.

3

The record amply supports that finding that the actions of the government in executing the search warrants were a mere pretext for inappropriately obtaining confidential medical data about Major League Baseball players who were not under any particularized suspicion of criminal activity. The government first sought the information about all Major League Baseball players in its initial grand jury subpoena. After objection from the Players Association and CDT, the government (without withdrawing its initial subpoena) issued a new subpoena limited to information about players about whom the government had a reasonable suspicion were connected to Balco.

The initial search warrant purported to be limited to the players associated with Balco. Indeed, the affidavit purported to justify obtaining information to link test results to individual players "to ensure that samples of individuals not associated with Balco are left undisturbed." However, once it had taken all of the data off site, it proceeded with new warrants to search the data it already possessed for evidence of positive steroid markers. There was no evidence in the exhaustive Balco investigation that any of these players had any connection to Balco, as the government concedes.

When the entire record is examined, it appears that the government was attempting to obtain all medical data about all Major League Baseball players, and using the search warrant for the limited number of players as a pretext for doing so. The procedure employed by the government at the search buttresses this conclusion. CDT had segregated the information about the ballplayers who were the subject of the search warrant. However, the agents insisted on taking the entire directory of information about all players. To the extent the data

responsive to the warrant had not been provided in the segregated material, the information could have easily been isolated on site. Yet the government insisted on removing the entire directory.

CDT suggested using the *Tamura* procedure, under which a magistrate judge would first examine the data and segregate the non-confidential material. However, the government rejected that approach. Instead, the government seized everything, then examined it, then sought additional search warrants as protection against its unauthorized search.

These facts, among many others from the record, more than adequately support the conclusion that the government used the limited warrants as a pretext for conducting an unauthorized general search—a tactic we rejected in *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978).

4

The majority finally justifies the government's actions by concluding that the government had the right to seize all of the medical data because the data was "intermingled" with data responsive to the warrant. This conclusion is the one with which I have the most profound disagreement with the majority.

There is no doubt that the agents did not comply with the warrant. They seized an enormous amount of personal property belonging to individuals not under any suspicion of criminal activity. A warrantless search is, of course, presumptively unreasonable. *United States v. Karo*, 468 U.S. 705, 714-15 (1984). As the Supreme Court explained in *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971):

> Thus the most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are

per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption [ ] that the exigencies of the situation made that course imperative. The burden is on those seeking the exemption to show the need for it. (quotation marks and citations omitted).

The government concedes that it had no probable cause or even particularized reasonable suspicion that could have formed the basis for the issuance of a search warrant to obtain the physical samples, and the data obtained from testing the samples, concerning the players who were not involved in the Balco investigation. The government's particularized warrants were limited to ten identified players whom the government alleged it had reason to believe were involved with Balco.

The majority endorses the warrantless seizure and search of confidential medical information pertaining to individuals not under any criminal suspicion, reasoning that the existence of a handful of relevant records justifies the seizure and subsequent search of thousands of irrelevant records. I respectfully disagree.

The majority's holding squarely conflicts with our prior precedent. For decades, we have eschewed the indiscriminate search and seizure of materials that are not responsive to a valid search warrant. In *Tamura*, we stated that "the wholesale *seizure* for later detailed examination of records not described in a warrant . . . has been characterized as 'the kind of investigatory dragnet that the fourth amendment was designed to prevent.' " 694 F.2d at 595 (quoting *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980)). *Tamura* held that "the government's wholesale seizure of company documents [is] illegal [when] the agents intentionally seize[ ] materials they [know] were not covered by the warrant."

*United States v. Hill*, 322 F. Supp. 2d 1081, 1088 (C.D. Cal. 2004) (Kozinski, J., sitting by designation).

Here, it was clear to the investigating officers that they were seizing a sizable amount of data that was not responsive to the warrant. Indeed, the Tracey directory itself was determined to contain 2,911 files, with an unknown amount of data in each file, that were not connected with Major League Baseball player drug testing at all. The directory contained test results for thirteen other sports organizations, two business entities, and three sports competitions. The sub-directories were quite clearly named, so that it was obvious to the casual observer that if the files in the directories correlated to the name—and there was no reason to think otherwise—the material had nothing to do with the ten players listed in the warrant. In the files that concerned Major League Baseball players, there was information on approximately 1,200 players, with multiple test results.[9]

The majority relies on *United States v. Beusch*, 596 F.2d 871 (9th Cir. 1979), to establish that the government's seizure of the entire Tracey directory was reasonable. However, as the majority acknowledges, this court "limited the reach of *Beusch*'s holding to 'single files and single ledgers, i.e., single items which, though theoretically separable, in fact constitute one volume or file folder.' "

---

[9]The majority tries to distinguish what the agents did here from what transpired in *Tamura* by stating that, here, the agents took only a *copy* of the Tracey Directory and not the master files as was the case in *Tamura*. Yet when the countervailing interest is privacy and not merely the disruption of business, that interest suffers whether it is copies or originals that are seized. The majority also points out that the agents here did not take the whole computer or all of the computers in CDT's office. This distinction fails to recognize the difference between the computer age and the paper age. All of the files in one directory on one computer in today's world could very well constitute the equivalent of all the files in an entire office in yesterday's paper era.

Here, the government seized the entire Tracey directory, not only the individual spreadsheet containing the Major League Baseball players' test results. In *Beusch*, we specifically stated that "[t]he reasons we have given for allowing their seizure may not apply to sets of ledgers or files . . . ." 596 F.2d at 877. On many computers, all of a user's documents are found in a single directory. To apply *Beusch* to the computer context in the way the majority suggests would permit the government to seize *all* the documents on a given computer if only one document therein was responsive to the warrant. This is precisely what *Beusch* explicitly said it did not intend to permit in the paper documents context.

The majority's holding that the government was entitled to seize all records in the file because the non-Balco drug test results were "intermingled" in the same file puts Americans' most basic privacy interests in jeopardy. Such a rule would entitle the government to seize the medical records of anyone who had the misfortune of visiting a hospital or belonging to a health care provider that kept patient records in any sort of master file which also contained the data of a person whose information was subject to a search warrant. I agree entirely with Judge Illston's observation that the implications of approving such behavior are staggering. Under the majority's holding, no laboratory or hospital or health care facility could guarantee the confidentiality of records.

The majority attempts to discount this possibility, but offers no principled reason why it does not apply in hundreds of other contexts. Indeed, under questioning from the district judges, the government did not discount the possibility of other widespread searches.[10]

---

[10]For example, a hearing before Magistrate Judge Johnson contained the following colloquy between government counsel and the Court:

> Court:     * * * If there is some other drug testing lab apart from CDT, would you ever use — but the test for the ten were at CDT. Would you ever use this informa-

As the Supreme Court has observed, "[i]t is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 583 (1980). It was for this reason that the particularity requirement in warrants was adopted. As the Court noted in *Maryland v. Garrison*, 480 U.S. 79, 84 (1987):

> tion to go and say — just demand that you can get the drug testing results from other labs that test professional athletes . . . . Based on the theory that it's systemic. And so there's a problem, there's a problem. And we know that these other labs test athletes, too. So can you just go search?

Counsel:    Yes, your honor.

Similarly, in another hearing Judge Illston asked government counsel whether he thought it was possible to take the information from the Tracey directory concerning other sports organizations and use individual test results of athletes to launch another investigation. Strikingly, Judge Illston posed it as a hypothetical, but the government did not appear to deny that officers may have viewed individual records in other sports:

Court:    What if hockey had a subdirectory that had positive results and he clicked on it to make sure it was what it said it was, by George, that's what it was, what about that?

Counsel:    I don't know in checking to make sure it was hockey that didn't happen. If it did happen, I would think that theoretically Agent Novitsky would have the right to either request a search warrant or, I suppose, if you looked at it enough, it's possible that it was obvious, it was plain view, it was other drug use by hockey players. So there might be a legal entitlement for Agent Novitzsky to use that and do something with it. It hasn't happened in this case. I suppose that's theoretically possible, again, you would have, I believe, probable cause to believe that evidence in there would lead to other persons potentially involved in disputable criminal drugs, which is the crime that's under investigation.

> The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one "particularly describing the place to be searched and the persons or things to be seized." The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.

Unfortunately, the majority's theory—as well as the government's—causes just this type of result. The more sensible theory with respect to electronic data is to enforce the procedure outlined in *Tamura* and require that a neutral magistrate examine the co-mingled data that the government proposes to seize to make sure that private information that the government is not authorized to see remains private. Agents who expect to encounter intermingled data or who unexpectedly encounter it may not review the data unabated, but must seek a magistrate's guidance on how to proceed. This procedure need not impose impossible burdens on law enforcement. After seizure, the data is secure and may be reviewed in an "informed and deliberate" manner by a "neutral and detached" magistrate, rather than being secreted for indiscriminate examination by government officials.

*Tamura* described a procedure that would impose a check on the government's ability to engage in such behavior. We advised that where "documents are so intermingled that they cannot be feasibly sorted on site," that law enforcement officers should "seal[ ] and hold[ ] the documents pending approval by a magistrate . . . ." *Id.* at 595-96. As we noted:

> The essential safeguard required is that wholesale removal must be monitored by the judgment of a

neutral, detached magistrate. In the absence of an exercise of such judgment prior to the seizure in the present case, it appears to us that the seizure, even though convenient under the circumstances, was unreasonable.

*Id.* at 596 (footnote omitted).[11]

The majority overrules the *Tamura* procedure, allowing the government to search and seize documents without prior magistrate approval. This holding conflicts with *Tamura*.

Therefore, I respectfully disagree with the majority's assertion that the government's action in this case complied with the Fourth Amendment, and that the procedures outlined in *Tamura* should be rejected. There is no doubt that the agents violated the terms of the search warrant.

5

The government did not advocate the position adopted by the majority. The government's sole justification for the warrantless seizure of the data of the unlisted players is that it was in "plain view," which is one of the limited exceptions to the Fourth Amendment's warrant requirement. Although the majority did not reach this question, the theory formed the entire basis for the government's legal justification for its actions and was the primary focus of the proceedings before the district courts. Therefore, it is important to address it to

---

[11]The Tenth Circuit adopted the *Tamura* approach specifically in the computer context in *Carey*, holding that:

> Where officers come across relevant documents so intermingled with irrelevant documents that they cannot feasibly be sorted at the site, the officers may seal or hold the documents pending approval by a magistrate of the conditions and limitations on a further search through the documents.

172 F.3d at 1275.

demonstrate the soundness of the various decisions by the district courts.

The plain view doctrine is based on the assumption that if there is probable cause for the search, and the officer is legally entitled to be at the premises under the Fourth Amendment, seizure of an object in plain view that is contraband or evidence of a crime does not involve an invasion of privacy. *Payton*, 445 U.S. at 586-87. The Supreme Court has identified several conditions that must be satisfied before a plain view seizure of an object is upheld: (1) the officer conducting the seizure must lawfully arrive at the position from which the object is plainly seen; (2) the object must be in plain view; (3) the object's incriminating character must be "immediately apparent," that is, the officer must have probable cause to believe the object is contraband or evidence of a crime; and (4) the officer must have a lawful right of access to the object itself. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *Horton*, 496 U.S. at 136-37; *Texas v. Brown*, 460 U.S. 730, 737 (1983).

Under the circumstances presented by this case, not only is it clear that the government had not met its burden of establishing that the seizure of the data was justified under the plain view doctrine, but it is also clear why the plain view doctrine would be inappropriate to apply in the computer context.

a

The fundamental requirement of the plain view doctrine is that the object seized be in "plain view," that is, "obvious to the senses." *United States v. Sifuentes*, 504 F.2d 845, 848 (4th Cir. 1974). After an extensive colloquy, Judge Illston concluded that the computer data seized was not in "plain view." Not only is this factual conclusion not clearly erroneous, the undisputed record completely supports her conclusion under any standard of review.

As Judge Illston pointed out, this was not a case in which an incriminating photo or similar evidence could be viewed on a computer screen; rather, at best, it involved scrolling through thousands of records none of which were immediately visible. In its application for a search warrant, the government justified removal of data and computer equipment on the basis that:

> The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10′ x 12′ x 10′ room to the ceiling.

The government also indicated in its affidavit that it would be using consulting computer specialists to analyze the data. The affidavit explained:

> Searching computer systems is highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impractical to bring to the search site all of the necessary technical manuals and specialized equipment to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of

computer software application or operating system that is being searched.

According to the government, the search of the computers at CDT could not be completed at the scene. There were, in fact, 16 computers. However, one computer was eventually isolated and data retrieved. As Special Agent Novitsky's memorandum of activity stated:

> At approximately 2:35 p.m., S/A Abboud began working on a computer with [a CDT employee]. [She] directed us to a computer in the office labeled "E" for purposes of the search warrant and sketch. At this computer, [she] identified a sub-directory entitled "Tracey", which she said contained all of the computer documents for CDT's sports drug testing division. A cursory review of the subdirectory indicated multiple further subdirectories and several hundred computer files. As authorized by the warrant, because of the length of time it would take to search each file and the intrusiveness it would cause on CDT, it was decided to make a complete copy of the "Tracey" subdirectory in order to perform a search of it in the IRS-CID offices at a later time.

Agent Novitsky later explained in a subsequent affidavit that:

> This subdirectory contained hundreds of files and a significant amount of computer data. After consulting with agents at the scene specifically trained in the search of computers, we determined that we could not realistically search the entire directory on-site in a reasonable amount of time. We therefore made the determination to copy the entire sub-directory.

After it was examined, the Tracey directory itself was determined to contain 2,911 files, with an unknown amount

of data in each file, that were not connected with Major League Baseball player drug testing at all. In the files that concerned Major League Baseball players, there was information on approximately 1,200 players, with multiple test results.

Given these circumstances, the data seized cannot be considered to be in "plain view." As the Supreme Court has noted, "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object — *i.e.,* if its incriminating character is not immediately apparent, the plain view doctrine cannot justify its seizure." *Dickerson*, 508 U.S. at 375 (alterations and quotations omitted). The data now sought by the government was not "obvious to the senses" at the scene, nor were the positive tests in "plain view" from a glance at a computer screen. The data required analysis and thorough examination off-site before the data at issue was discovered.

The "plain view" doctrine is inapplicable in the general electronic context because it is at complete odds with the underlying theory of the doctrine. As the Supreme Court has explained:

> The theory of that doctrine consists of extending to nonpublic places such as the home, where searches and seizures without a warrant are presumptively unreasonable, the police's longstanding authority to make warrantless seizures in public places of such objects as weapons and contraband. And the practical justification for that extension is the desirability of sparing police, whose viewing of the object in the course of a lawful search is as legitimate as it would have been in a public place, the inconvenience and risk—to themselves or to preservation of the evidence—of going to obtain a warrant.

*Horton*, 480 U.S. at 326-27 (internal citations omitted).

Neither of those considerations is present when we consider the off-site examination of electronic data. As the government essentially acknowledged in its search warrant applications, examination of computer data is a forensic exercise. It necessarily involves the application of software to interpret the data; without external software aid, the data would appear only as binary numbers. In addition, as in this case, the government often requires computer specialists to decipher the data. Electronic data is simply not the kind of evidence that forms a natural extension of an officer's discovery of obvious contraband in a public place. The fact that further careful electronic assistance is required outside the searched premises to interpret the data belies the "practical" justification that there is insufficient time to obtain a warrant. Indeed, electronically assisted searches of binary numbers bear a closer resemblance to the thermal imaging searches of homes that the Supreme Court rejected as violative of the Fourth Amendment in *Kyllo v. United States*, 533 U.S. 27 (2001).

The ultimate fact that, after the assistance of electronic software programs, the data may be observed "in plain view" does not alter this conclusion. As the Supreme Court has warned:

> [I]n the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

*Coolidge*, 403 U.S. at 465.

The off-site forensic examination of computer data is simply not one of those circumstances that fits the "plain view" paradigm. Indeed, to hold otherwise would be to write out the Fourth Amendment's particularity requirement with respect to

electronic data and to transform particularized search warrants into general search warrants, with the government authorized to conduct indiscriminate, dragnet searches.

b

The government also failed to sustain its burden to establish the plain view exception because, as the district courts found, the incriminating character of the information was not "immediately apparent." It was clear under the testing protocol that positive tests did not necessarily reflect steroid use; the use of nutritional supplements—which is common in professional sports—could also yield a false positive. In addition, there are a whole host of legitimate reasons for individuals to be prescribed steroid products. The CDT testing was not undertaken to test individual players; but rather to provide a survey for the possible establishment of an individual drug testing protocol.

What the government relied on was sheer speculation that the presence of positive steroid markers would mean that the athlete had received steroids without prescription from some unknown person. The crime that the government was interested in pursuing was the illegal *distribution* of steroids. The evidence of a positive test was not affirmative evidence of any distribution. The government's theory was that, armed with the test results, the government could then summon the athlete before a grand jury to see if it could obtain evidence from whom and under what circumstances the athlete may have obtained steroids.

However, the mere suspicion of criminal activity or the suspicion of knowledge of a criminal activity is not sufficient to sustain a seizure of evidence under the plain view doctrine. As the Supreme Court has made abundantly clear, the "immediately apparent" requirement means that the law enforcement officer must have *probable cause* to seize the property that the officer observed in plain view. As the Court explained:

> We now hold that probable cause is required. To say otherwise would be to cut the "plain view" doctrine loose from its theoretical and practical moorings. . . . Dispensing with the need for a warrant is worlds apart from permitting a lesser standard of *cause* for the seizure than a warrant would require, i.e., the standard of probable cause. No reason is apparent why an object should routinely be seizable on lesser grounds, during an unrelated search and seizure, than would have been needed to obtain a warrant for that same object if it had been known to be on the premises.

*Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987).

The government conceded that it did not have probable cause to search or seize any data or specimens beyond the ten players listed in the warrant. For those players, the government provided extensive information showing their alleged connection to Balco. However, the government conceded that it had *no* information connecting any of the other players to Balco. Indeed, it made that clear in both its affidavits and subsequent hearings. The affidavit provided to Judge Lloyd speculated that evidence might be developed linking the players who tested positive to Balco "because of the closely-knit professional baseball community," but also speculated that the positive test results could suggest "another significant source of illegal performance-enhancing drugs." In fact, the government had no evidence whatsoever that it tendered in support of either theory. The government did not have any information concerning who might be involved in any distribution scheme; in fact, it had no idea at all.[12]

---

[12]For example, the government engaged in the following colloquy at one hearing:

Counsel:   Your honor, it's evidence because it's evidence of an illegal distribution of steroids to other people.

Court:     From where?

Counsel:   From where? That's an excellent question, and that is why we need the evidence.

The government did not submit any evidence contradicting the affidavits indicating the possibility of false positives and that a positive result did not necessarily indicate illegal steroid use. There was no specific target of the investigation against whom the government sought incriminating evidence.

Mere speculation is not sufficient to establish probable cause. *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987). Perhaps the government had reasonable suspicion, but that is not sufficient to justify a seizure under the plain view doctrine. *See Hicks*, 480 U.S. at 326 (holding that "probable cause is required"); *Payton*, 445 U.S. at 587 (explaining the plain view requirement that there be "probable cause to associate the property with criminal activity.").

6

For all of these reasons, I would hold that the finding that the government acted in callous disregard of the rights of the players is completely supported by the record. The district courts made no error, much less a clear error, in finding that the first *Ramsden* factor was satisfied. The district courts rightfully rejected the government's "plain view" justification, and I respectfully disagree with the majority's new rule rejecting the sound procedures described in *Tamura*.

B

The second *Ramsden* factor is whether the movant has an individual interest in and the need for the property he wants returned. I agree with the majority and the district courts that the Players Association satisfied this requirement. At issue are the Fourth Amendment rights of the players. As we know, the Fourth Amendment protects people from unreasonable searches and seizures into areas in which they have a legitimate expectation of privacy. *Katz v. United States*, 389 U.S. 347, 360-61 (1967) (Harlan, J., concurring). There is no doubt that the affected baseball players had a justified,

constitutionally-protected privacy interest in the seized property, including the computer data and the physical urine samples. However, I believe that the majority significantly discounts and underestimates the importance of the privacy interests at stake.

The legitimate expectation of privacy in medical information is as old as the Hippocratic Oath.[13] Indeed, "[o]ver the last thirty years, the federal courts have uniformly accepted the principle that medical records are private and entitled to protection." Joel Glover and Erin Toll, *The Right to Privacy of Medical Records*, 79 Denv. U. L. Rev. 540, 541 (2002). In this context, the Supreme Court has recognized at least two distinct kinds of constitutionally-protected privacy interests: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Doe v. Attorney General*, 941 F.2d 780, 795 (9th Cir. 1991) (quoting *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977)).

We have long applied *Whalen* and its progeny in holding that "[i]ndividuals have a constitutionally protected interest in avoiding 'disclosure of personal matters,' including medical information." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004); *see also Norman-Bloodsaw v. Lawrence Berkeley Laboratory*, 135 F.3d 1260, 1269 (9th Cir. 1998) ("The constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality."); *Yin v. California*, 95 F.3d 864, 870 (9th Cir. 1996) (noting that "individuals have a right protected under the Due Process Clause of the Fifth or Fourteenth Amendments in the privacy of personal medical information and records."); *Doe*, 941 F.2d at 795-96 (holding

---

[13]STEDMAN'S MEDICAL DICTIONARY, 799 (26th ed. 1995) ("All that may come to my knowledge in the exercise of my profession or outside of my profession, or in daily commerce with men, which ought not to be spread abroad, I will keep secret and will never reveal.")

that individual has privacy interest in medical information, including diagnosis); *Caesar v. Mountanos*, 542 F.2d 1064, 1067 n.9 (9th Cir. 1976) (noting that the right to privacy encompasses the doctor-patient relationship). As we have observed, "[o]ne can think of few subject areas more personal and more likely to implicate privacy interests . . . ." *Norman-Bloodsaw*, 135 F.3d at 1269.

If there were any doubt, the Supreme Court held in *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001), that individuals enjoyed a reasonable expectation of privacy in medical test results and that "the results of those tests will not be shared with nonmedical personnel without [the patient's] consent."

Congress has also recognized the importance of privacy in medical records in a variety of contexts, most prominently in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (1996).[14]

---

[14]HIPAA was far from Congress's first foray into privacy protection. As the United States Department of Heath and Human Services noted:

> In the 1970s, individual privacy was paramount in the passage of the Fair Credit Reporting Act (1970), the Privacy Act (1974), the Family Educational Rights and Privacy Act (1974), and the Right to Financial Privacy Act (1978). These key laws were followed in the next decade by another series of statutes, including the Privacy Protection Act (1980), the Electronic Communications Privacy Act (1986), the Video Privacy Protection Act (1988), and the Employee Polygraph Protection Act (1988). In the last ten years, Congress and the President have passed additional legal privacy protection through, among others, the Telephone Consumer Protection Act (1991), the Driver's Privacy Protection Act (1994), the Telecommunications Act (1996), the Children's Online Privacy Protection Act (1998), the Identity Theft and Assumption Deterrence Act (1998), and Title V of the Gramm-Leach-Bliley Act (1999) governing financial privacy.
>
> In 1997, a Presidential advisory commission, the Advisory Commission on Consumer Protection and Quality in the Health

In the regulations promulgated pursuant to HIPAA, the United States Department of Health and Human Services emphasized the importance of maintaining the privacy of medical information, concluding that "[p]rivacy is a fundamental right" and that "[a] right to privacy in personal information has historically found expression in American law."[15] 65 Fed.Reg. at 82,464.

In sum, given controlling legal authority, there is no question that the baseball players who participated in the random testing had a justified expectation of privacy in the test results and, in particular, that the test results would not be disclosed.[16]

Care Industry, recognized the need for patient privacy protection in its recommendations for a Consumer Bill of Rights and Responsibilities (November 1997). In 1997, Congress enacted the Balanced Budget Act (Public Law 105-34), which added language to the Social Security Act (18 U.S.C. 1852) to require Medicare+Choice organizations to establish safeguards for the privacy of individually identifiable patient information. Similarly, the Veterans Benefits section of the U.S. Code provides for confidentiality of medical records in cases involving drug abuse, alcoholism or alcohol abuse, HIV infection, or sickle cell anemia (38 U.S.C. 7332).

*Standards for Privacy of Individually Identifiable Health Information*, 65 Fed.Reg. 82,462, 82,469 (Dec. 28, 2000) (codified at former 45 C.F.R. pts. 160, 164 (2002)).

[15]The Department also emphasized that "While privacy is one of the key values on which our society is built, it is more than an end in itself. It is also necessary for the effective delivery of health care, both to individuals and to populations. . . . The need for privacy of health information, in particular, has long been recognized as critical to the delivery of needed medical care." 65 Fed.Reg. at 82,467.

[16]That the athletes had a justified, reasonable expectation of privacy in the urine samples themselves that were seized by the government is beyond question. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 615-617 (1989) ("it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . .").

Of course, under appropriate circumstances, justified privacy expectations may be altered by contract. *Yin*, 95 F.3d at 872. In this instance, the ballplayers' privacy expectations were heightened, not diminished, by the collective bargaining agreement between the Major League Baseball Players Association and Major League Baseball. The agreement was forged after years of impasse concerning steroid testing and, as I have discussed, called for anonymous testing to determine the scope of the problem. To that end, the agreement provided, in relevant part that:

> 1.   During the 2003 season (which shall include spring training but not include the post-season), all Players will be subject to two tests (one initial test and one follow-up test conducted not less than five and not more than seven days following the initial test) at unannounced times for the presence of Schedule III steroids ("Survey Testing"). In addition the Office of Commissioner shall have the right to conduct additional Survey Testing in 2003 in which up to 240 players, selected at random, may be tested.

> 2.   If the results of the Survey Testing conducted in 2003 show that more than 5% of Players tested test positive for Steroids, all Players will be subject to two unannounced tests (an initial test and a followup test five to seven days later) for Steroids during the 2004 season ("Program Testing"). If a Player tests positive in the Program Testing, he shall immediately be placed on the Clinical Track and shall be subject to discipline for further violations. The Program Testing shall continue each season until less than 2.5% of the Players tested test positive for Steroids for two consecutive seasons combined.

In short, the only objective of the 2003 testing was to ascertain whether the threshold had been exceeded; it was not intended to test and monitor individual baseball players.

Indeed, the testing protocol was designed to prevent the identification of individual players and the matching of players with test results. The record does not reflect whether any individual player was even informed of his testing results for the 2003 sample year.

The collective bargaining agreement contains numerous provisions assuring confidentiality. For example, the section concerning the testing protocol provides:

> The confidentiality of the Player's participation in the Program is essential to the Program's success. Except as provided in Section 8, the Office of the Commissioner, the Association, HPAC, Club personnel, and all of their members, affiliates, agents, consultants and employees are prohibited from publicly disclosing information about the Player's test results, Initial Evaluation, diagnosis, Treatment Program (including whether a Player is on either the Clinical or Administrative Track), prognosis or compliance with the Program.

The collective bargaining agreement specified in great detail the manner of collection of data and, in particular provided that:

> At the conclusion of any Survey Test, and after the results of all tests have been calculated, all test results, including any identifying characteristics, will be destroyed in a process jointly supervised by the Office of the Commissioner and the Association.

The record contains many more references to the assurance given Major League Baseball players that the 2003 tests would be anonymous and kept confidential, which are unnecessary to detail. There simply is no doubt whatsoever that the players had a justified, constitutionally protected privacy interest in the test results — an interest that was further

enhanced by the many protections and contractual obligations contained in the collective bargaining agreement under which the tests were conducted.

In sum, the players had a significant privacy interest in the medical records and physical specimens. There is no doubt that the players have an individual interest in and a need for the property to be returned. Thus, the second *Ramden* factor is satisfied.

## C

I agree with the majority and the district courts that the players would be irreparably injured by denying the return of property. As the majority notes, the government has already conceded that the players have no adequate remedy at law for the redress of their grievances. Therefore, the third and fourth *Ramsden* factors are satisfied.

For these reasons, I agree with the majority that the district courts properly exercised equitable jurisdiction. However, I would hold that the district courts correctly found that all four *Ramsden* factors were satisfied. I disagree with the majority that the government's actions properly respected the privacy rights of the players.

## IV

We review a district court decision to exercise its equitable jurisdiction under Rule 41(g) under the deferential abuse of discretion standard. *Ramsden*, 2 F.3d at 324. I not only fail to see any abuse of discretion in the decisions by the district judges to exercise their equitable jurisdiction, I agree entirely with the district courts that the seized property should be returned.

A

The Advisory Committee Notes to the 1989 amendments to Rule 41(g) tell us that "reasonableness *under all of the circumstances*" should be the governing standard for determining whether property should be returned. (emphasis added). Those same notes state that "[i]f the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable," but that "in certain circumstances . . . equitable considerations might justify requiring the government to return or destroy all copies." *Id.*[17]

Deciding between the two hinges on "whether the Government's conduct was sufficiently reprehensible in this case to warrant this sanction." *Ramsden*, 2 F.3d at 327. As the actions I have discussed make clear, the government's behavior was sufficiently reprehensible and the privacy interests of the players who were neither named in the warrant nor implicated in any criminal activity sufficiently important to affirm the granting of the 41(g) motions. Simply put, there is no reason for the government to retain confidential medical information and bodily fluids of citizens who are not under any particularized suspicion of criminal activity.

B

I have already detailed my disagreement with the majority's evisceration of the *Tamura* procedure. In addition to that, I strongly disagree with the new procedure adopted by the majority to supplant *Tamura*. The majority proposes that the

---

[17]The cases the majority cites for the proposition that return of property is inappropriate when the government still needs it as evidence are hardly analogous to the present case. In both *United States v. Mills*, 991 F.2d 609, 612-13 (9th Cir. 1993), and *United States v. Fitzen*, 80 F.3d 387, 388-89 (9th Cir. 1996), the person seeking return of the property was the criminal defendant himself, not an innocent third party, and the court found in both cases that the defendants didn't even have a legitimate claim of ownership to the property.

government may seize all computer databases containing intermingled evidence, and if an objection is raised, must then turn the material over to a magistrate judge for review. Under the majority's new rule, the magistrate judge is to allow the government to retain the data if it is not feasible to segregate material responsive to the warrant without altering the original character of the information.

1

The majority's remedy violates the "neutral and detached magistrate" requirement. As the Supreme Court observed many decades ago:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Johnson v. United States*, 333 U.S. 10, 13 (1948).

The protections of requiring a "neutral and detached magistrate" to make "informed and deliberate determinations" concerning probable cause are lost when the magistrate's review comes after the material has been seized and searched. As the Supreme Court explained in *Aguilar v. Texas*, 378 U.S. 108 (1964):

> The reasons for [the neutral and detached magistrate] rule go to the foundations of the Fourth Amendment. A contrary rule "that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amend-

ment to a nullity and leave the people's homes secure only in the discretion of police officers."

*Id.* at 111 (quoting *Johnson*, 333 U.S. at 14).

For a magistrate's role to be effective, it must come before the privacy interests have been compromised. Under the majority's holding, the government is newly empowered to search the data *before* the magistrate authorizes the search. This flips the traditional relationship of the magistrate to the searching officer on its head. In all other contexts, the magistrate stands between the government and the privacy of individuals; in the majority's proposed world, the magistrate only appears after the privacy interests have been invaded.

Worse, under the majority's holding, the seized material is not presented to a magistrate at all except upon a "proper post-seizure motion by the aggrieved parties." In other words, if no motion is made, there is never an "informed and deliberate" examination of probable cause by a "neutral and detached magistrate." The government simply keeps and searches the confidential data it seized without any suspicion of criminal activity. But how precisely is an honest citizen to know if his or her confidential medical records have been seized by the government so that he or she may seek redress? The search warrant is not directed to the innocent party; it is served on the data repository. In the case at bar, the parties knew of the seizure of data pursuant to the search warrant because they were litigating (or at least thought they were litigating) the production of the material pursuant to a grand jury subpoena. However, at least until this opinion has been issued, no one in the National Hockey League knew that the government had seized medical records pertaining to its players without a warrant. Indeed, in the normal case, when a search warrant is directed to a third party, the innocent citizen whose privacy interests are at stake will have no notice whatsoever that his privacy interests have been compromised.[18]

---

[18]This problem is one of the reasons why the use of search warrants against third parties is strongly discouraged.

Without notice, the "aggrieved party" will have no opportunity to make a "proper post-seizure motion" to have the material reviewed by the magistrate. The oddity of the majority's holding is readily apparent: those suspected of crime or involved in some manner in the underlying criminal investigation will learn of the seizure and can take steps to protect their Fourth Amendment rights. However, the completely innocent citizen with no involvement in the underlying investigation whose data has been seized will not have notice or any opportunity to protest. It is quite difficult to understand how this procedure protects the right of law-abiding citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

Even if, as in this case, a representative of the innocent "aggrieved party" had sufficient notice of the seizure, the innocent citizen is now required under the majority holding to hire an attorney and make a "proper post-seizure motion" to require the government do to what the Fourth Amendment required it to do in the first instance: establish before a neutral and detached magistrate that probable cause exists to seize and search the property.

In sum, under the majority's holding, the eversion of the Fourth Amendment is thus rendered complete. The government is entitled to warrantless searches and seizures without probable cause or particularized suspicion, and the honest citizen bears the cost and the burden of showing that the government should have demonstrated probable cause before seizing and searching the law-abiding citizen's personal property.

2

The majority's holding unfortunately does not stop with requiring citizens to force the government to establish probable cause. Under the majority holding, even if a neutral and detached magistrate concludes after an informed and deliberate examination of the data that the government has not estab-

lished probable cause, the magistrate is not directed to limit the seizure. To the contrary, if the magistrate determines that confidential data cannot be separated, or cannot be separated "without creating new documents," or that the unrelated confidential information cannot be excised "without distorting the character of the original document," then the government is entitled to keep the unrelated confidential data without showing probable cause or reasonable suspicion. In the age of electronic data, this holding virtually eliminates Fourth Amendment protections for confidential data. The usual practice is to err on the side of redaction for the protection of those whose privacy interests may be unnecessarily jeopardized. Unfortunately, the majority tilts the balance in the opposite direction, encouraging magistrates to allow the government to retain all unrelated data if the original data is co-mingled in some fashion.

Placing restrictions on magistrate's ability to redact information and allowing the government to retain whole databases of confidential electronic information on the theory that some data relevant to the warrant is "co-mingled" defies common sense and the realities of electronic data storage. One of the chief advantages of electronic data storage is that it allows large volumes of information to be retained in a very small space, such as a computer hard drive. Another advantage of electronic data storage is the ease of searching and examining data. A relational database, such as the one at issue in this case, is one in which the database is organized and accessed according to the relationships between data items without the need for any consideration of physical orientation and relationship. Software programs allow the examination and correlation of information. A relational database provides the perfect vehicle for segregating non-relevant information. For example, in this case, a simple search would have yielded the information responsive to the search warrant.[19] However, an

---

[19]The majority suggests that I would place the searching agents under a duty to rely on CDT to guide their search, but I suggest no such thing.

inherent feature of a relational database is that data is "co-mingled." Instead of using the power of a relational database to protect legitimate privacy interests, the majority would adopt a rule discouraging—if not precluding—such a use. Under the majority's approach, the government would be entitled to retain all electronic information if "co-mingled." Given that "co-mingling" is an inherent aspect of electronic databases, this restriction renders the Fourth Amendment a nullity in the electronic context.

The logic is circulate and the result completely predictable. The government is entitled to seize property without a warrant only if it is "co-mingled" and cannot be segregated. Then, if a party objects the seizure, the data must be presented to a magistrate judge who must release it back to the government intact if the magistrate judge determines that the irrelevant data is "co-mingled" and cannot be segregated. The exercise is purely illusory and can only lead to an intellectual cul-de-sac. The Fourth Amendment's probable cause requirement is neatly and entirely eliminated.

The majority not only countenances this procedure, but encourages it. I cannot agree. In the electronic age, magistrate judges should be required to use all available tools—software as well as black marker—to redact confidential information not responsive to a warrant in order to protect the privacy of innocent citizens who are not suspected of any crime.

3

The profound consequences of the majority rule are readily demonstrated by the case at bar. Because they had no notice

---

When data searching functions are available, as they were here, agents or their consultants are perfectly capable of conducting key word searches themselves, with or without any information from the party being searched. Here, CDT—a third party entity not suspected of any crime—offered to segregate the data utilizing the functions of the program. A further, and much better alternative, would be to transfer the data to a magistrate judge for segregation and management.

of the governments's seizure, no objections were filed by the thirteen other major sports organizations, three unaffiliated business entities, and three sports competitions whose data was seized. Therefore, a magistrate will never review that unauthorized seizure under the majority holding. Under the majority's rule, the government will also be allowed to retain all of the information it seized from those who did object because the information is co-mingled and cannot be segregated without changing its original character.

There is no need to reinvent the wheel. The *Tamura* procedure has been part of our court's precedent for almost a quarter of a century. *Tamura* provides a practical and sensible method by which the government may obtain data to which it is rightfully entitled without violating the constitutional rights of honest citizens. We should reaffirm *Tamura*, not supplant it.

V

For similar reasons, I would also affirm Judge Illston's decision to quash the May 6, 2004, subpoenas. The majority contends that Judge Illston abused her discretion by resting her decision to quash the subpoenas on legally insufficient grounds, citing *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847 (9th Cir. 1991), for the proposition that subpoenas and search warrants serve different purposes and therefore arguing that it cannot be considered an abuse to use both methods of obtaining information. However, in this case, the government's conduct went beyond seeking warrants and subpoenas for the same information at the same time. As discussed previously, the government alternately sought subpoenas and warrants to obtain highly sensitive information from every Major League Baseball player and to continue to keep that information after being ordered to return it. Further, as previously noted, there were no substantiated risks justifying the use of a warrant to obtain the documentary evidence from a third party under 28 C.F.R. § 59.1(b).

In addition, it is worth nothing that the May 6 subpoenas requested much of the same information sought in the April 30 and prior search warrants. The affidavit to obtain the April 30 search warrant from Judge Lloyd averred that the material was necessary in part because the records may "establish a link to the charged defendants in this case." It is an abuse of the grand jury process to use grand jury subpoenas to develop post-indictment trial material. *See, e.g.*, *In Re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir.1985) (timing of subpoena, first issued after indictment, suggested that its purpose was to obtain trial material). The Balco indictments were returned in February. Therefore, the issuance of the May 6 grand jury subpoena, following on the heels of the search warrant application for the same information indicating that its partial purpose was to develop links to Balco, suggests an abuse of grand jury process.

Given the history of this case, the district court's conclusion that the filing of these subpoenas was "the culmination of a series of actions taken by the government in order to prevent the MLBPA and CDT's attempt to move to quash the January and March subpoenas" is fully supported by the record and certainly cannot be said to be an abuse of discretion.

## VI

I concur in the majority's conclusion that the media has standing on appeal to file a motion to unseal records. I also agree that, under the circumstances presented by this case, the motion should be referred to the district courts on remand.

I write separately to comment on what I view as a regrettable effort by both parties in the district courts to circumvent the procedures we have established to balance the First Amendment rights of the press with the confidentiality that is

required for some criminal proceedings.[20] Specifically, I note that all of the district court proceedings were closed by insistence of the parties, without notice to the press or public.

In some instances, courtroom closures were obtained without prior notice to the district court itself. For example, the transcript of one of the hearings before one of the district court judges reflects the following colloquy:

> Court:    Why is that, that you are locking the door?
>
> Clerk:    Since the case was filed under seal.
>
> Court:    Is this all under seal? * * * You want the hearings under seal. There was no motion made to seal the hearing. I wasn't aware you wanted it that way.
>
> Counsel:  Your honor, we filed the pleadings under seal. We think this proceeding should be under seal. The information at issue is highly confidential.

After some colloquy, the court allowed the courtroom to be sealed, but admonished counsel to file an appropriate motion if they wished any further courtroom proceedings to be closed in the future. However, neither the public nor the press were notified that the doors were to be locked and the public barred.

"Under the first amendment, the press and the public have a presumed right of access to court proceedings and documents." *Oregonian Pub. Co. v. District Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) (citing *Press-Enterprise Co. v. Superior*

---

[20]The government and the Players Association also sought to have oral argument in the court of appeals closed to the public. We denied that motion, and a subsequent motion for reconsideration.

*Court*, 464 U.S. 501, 510 (1985)("*Press-Enterprise I*"). "This presumed right can be overcome only by an overriding right or interest 'based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Id.* (quoting *Press-Enterprise I*, 464 U.S. at 510)

In determining questions of public and press access to the courts, courts are to examine whether a right attaches to a particular proceeding, using the Supreme Court's "logic and experience" test articulated in *Press-Enterprise v. Superior Court of California for the County of Riverside*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*"). "If a proceeding fulfills both parts of the test, a qualified First Amendment right of access arises, to be overcome 'only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Phoenix Newspapers, Inc. v. District Court*, 156 F.3d 940, 946 (9th Cir. 1998) (quoting *Press-Enterprise II*, 478 U.S. at 9-10). Provisions for narrow tailoring may include later release of transcripts, or redacted transcripts. *Id.* at 947.[21] In making its decision to close proceedings, "[t]he trial court must articulate this interest 'along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " *Id.* at 946-47. None of these procedural steps were undertaken in the district courts.

To be sure, the right of access to court proceedings is not absolute. *Id.* at 946. Both parties have legitimate privacy interests to protect. The Federal Rules of Criminal Procedure require "matters affecting a grand jury proceeding to be closed to the extent necessary to prevent disclosure of matters occurring before a grand jury." Fed. R. Crim. P. 6(e)(5). In addition, as I have discussed, the athletes represented by the Players Association have a very strong privacy interest in their medical records. However, there are non-grand jury

---

[21]Indeed, transcripts of court proceedings "must be released when the factors militating in favor of closure no longer exist." *Id.* at 947-48.

materials involved in this case, and there are some proceedings that do not appear to have involved confidential material.[22]

In any case, these are matters best considered in the first instance by the district court, with public notice so that the First Amendment right of access may be balanced with the privacy interests of the parties. Unfortunately, the parties presented hearing closure and record sealing as a *fait accompli* to the district courts, without notice to the press or public. Now that we have remanded the motion to unseal, this issue may be addressed.

## VII

In discussions of the alleged use of steroids by baseball players, much is made about "the integrity of the game." Even more important is the integrity of our legal system. Perhaps baseball has become consumed by a "Game of Shadows,"[23] but that is no reason for the government to engage in a "Prosecution of Shadows." The district judges were entirely right to order the government to return the thousands of private medical records it wrongfully seized by use of pretext and artifice.

I would affirm the orders of the district court and must respectfully dissent from the majority's contrary conclusion. I concur in the remand of the motion to unseal records.

---

[22]The government, in at least one proceeding, seemed to indicate that it might not oppose unsealing some material, with government counsel stating before Judge Mahan: "As a matter of DOJ regulation and policy, we actually have taken the position and we do take the position that there isn't a need to have these proceedings actually sealed, and that is because of the paramount interest in having actual public proceedings in courtrooms held in public." However, the government did not object formally to sealing the transcript of that hearing, and the transcript has, to date, been sealed.

[23]Mark Fainaru-Wada and Lance Williams, *Game of Shadows* (2006).